[Civ. No. 47407. Second Dist., Div. Five. July 27, 1976.]

JAMES RAY COLSON, Plaintiff and Appellant, v.
STANDARD OIL COMPANY OF CALIFORNIA,
Defendant and Respondent.

914

COUNSEL

R. Edward Brown for Plaintiff and Appellant.

Lawler, Felix & Hall, Thomas E. Workman, Jr., and David E. Lister for Defendant and Respondent.

OPINION

**HASTINGS, J.**—This is an appeal by James Ray Colson, plaintiff and appellant (Colson), from a judgment entered on a jury verdict after the trial judge directed a verdict in favor of defendant and respondent Standard Oil Company of California (Standard Oil) on the issue of punitive damages.

## STATEMENT OF FACTS

On January 17, 1967, on the premises of Standard Oil's petroleum refinery in El Segundo, California, Colson, an employee of the Sully-Miller Construction Company, an independent contractor, was injured while doing repair work on a surface road located in a remote area of the refinery. He was working near a place where the road passes over an 8,000-foot long, 4-inch diameter pipeline (4-inch line) used by Standard Oil to transport sulfuric acid needed for its operations. A small leak developed in a straight section of the pipeline, causing acid to spray on Colson's face, arms, and chest. He filed suit against Standard Oil, seeking compensatory damages and $1 million in punitive damages. The case went to trial and the jury returned a verdict for Colson in the sum of $100,000. The judge refused his request of instructions on punitive damages, and submitted the case to the jury only on the issues of negligence and compensatory damages. Standard Oil then moved for a new trial and the motion was granted on the ground that the evidence was insufficient to support the damages awarded. A new trial was ordered unless Colson consented to a reduction in the damages to $25,000. He did not accept this reduced award and the case was retried in August and September of 1971.

Prior to the commencement of the second trial, the trial judge ruled that Colson's fourth amended complaint did not allege sufficient facts to support his demand for punitive damages, and that he would not be allowed to introduce evidence on the punitive damage issue. Colson was, however, allowed to file a fifth amended complaint and again he demanded $1 million in punitive damages. Standard Oil demurred on the ground that the complaint did not state sufficient facts to constitute a cause of action for punitive damages, and the demurrer was sustained without leave to amend, leaving as the only issue to be tried liability and compensatory damages. Before the trial commenced, Standard Oil admitted liability and the jury awarded Colson $21,770.

Colson appealed, contending that the court erred in sustaining the demurrer on punitive damages, and that the size of the verdict was too low. After raising the issue of the adequacy of the damages, Colson abandoned it, but left standing his appeal on the demurrer. This court, Division I, in an unpublished opinion, 2d Civ. 40330, filed February 14, 1973, overruled the lower court's decision sustaining the demurrer, and

specifically held that an intent to injure is not an essential element of wilful misconduct.[1]

The case proceeded to trial on the sole issue of Colson's right to recover punitive damages. At the conclusion of Colson's evidence, Standard Oil moved for a judgment of nonsuit. This motion was argued extensively and the trial court took the matter under submission. Written briefs were filed by both parties, but then the parties agreed to allow Standard Oil to put on its evidence. At the conclusion of the defense evidence, Standard Oil having withdrawn its motion for nonsuit, moved for a directed verdict which the trial court granted.

## ISSUE

The sole issue is whether Colson produced evidence of the matters alleged in the complaint on punitive damages sufficient to constitute a question of fact to be determined by the jury, thus precluding a directed verdict by the court.

## DISCUSSION

It is Colson's contention that Division I's opinion set forth the evidence that he must produce to sustain the matters alleged in the complaint and that this standard became the "law of the case" on the issue of punitive damages. He claims substantial evidence was presented of wilful misconduct on the part of Standard Oil so that the issue should have gone to the jury.

Standard Oil does not disagree with Division I's opinion, but states that it merely held that "if proved, [it] would sufficiently justify the additional award . . . sought." Standard Oil argues that Colson did not produce evidence to prove the facts he alleged.

The opinion by Division I of this court did set forth the allegations that Colson had to prove to establish his right to punitive damages. They are as follows: that "[Standard Oil] knew or should have known that the condition of the premises, as maintained by it, was unreasonably

[1]After the appellate court's ruling, Colson moved the trial court for permission to file a sixth amended complaint in which he increased his demand for punitive damages from $1 million to $25 million. His motion was denied and he then filed a petition for writ of mandate with this court, alleging that the trial court's denial of his motion to increase his demand for punitive damages by $24 million was an abuse of discretion. The petition was denied.

dangerous to [Colson] and others similarly situated; also that [Standard Oil] knew or should have known that the injuries and/or harm to [Colson] were highly probable; and that [its] acts and omissions were 'willful and wanton and done with a wanton and reckless disregard of probable harm to [Colson].' " The issue can only be resolved by a review of Colson's evidence to see if it was sufficient to raise an issue of fact for determination by the jury.

## DISPOSITION

■ The key issue is whether there was evidence that Standard Oil's conduct was done either with knowledge that Colson and others similarly situated would probably receive serious injury, or with a wanton and reckless disregard of the possible results. (*Reuther* v. *Viall,* 62 Cal.2d 470, 475 [42 Cal.Rptr. 456, 398 P.2d 792].) Colson relies primarily on Division I's opinion with states: ."If, as alleged by plaintiff, the occurrence of some 50 leaks in this very same pipe (despite repeated requests to repair) over a period of 18 years and resulting in injuries to over 20 persons does not constitute the type of activity condemned, by this defendant, as above, we know of no conduct which may not be so classified" and the further statement: "It is then alleged that defendant failed to make necessary replacements and repairs by reason of its desire to keep its facilities operating despite the ever present danger of leaks and resultant injuries; . . ."

Colson claims all of these allegations were proved. He summarizes his proof as follows:

Charles Bopp, a chemical engineer and former employee of Standard Oil, as witness for Colson, testified to over 50 leaks in the 4-inch line. That the corrosion rate on the 4-inch line after July 12, 1965 indicated a life expectancy to be in months. Further, it was not good chemical engineering practice to run a line to failure in an area where there was potential harm to personnel.

Frank Carter, head equipment inspector for Standard Oil, testified that the 4-inch line that failed was installed in 1955 and was not replaced between that date and the date of the accident. That in a memo to his superior concerning the accident, he wrote that there was reference in Standard Oil's records about "deliberately going to failure" in the line before making replacements, and to admit this in court would be very damaging to the case.

Donovan E. Rasmussen, equipment inspector for Standard Oil, admitted that from prior failures and prior splits in the 4-inch line, his judgment on the corrosion rate was only an estimate. That he made recommendations for replacement of the line, but it was not replaced because of operating demands. Further, that he recommended (without success) that Standard Oil remove a steam line which ran only 14-16 inches from the acid pipe where the split occurred because it was too close and was causing corrosion.

Mr. Gardarian, Standard Oil's safety engineer, testified that Standard Oil knew that Sully-Miller's men (Colson's employer's men) were working in the area and that Standard did not have a supervisor there. He stated that he doubted that he told Sully-Miller or Colson there was acid running through this particular line, and he admitted there were no warning signs on that location. Also, there was no color code in any manner to warn people of dangers there.

Mr. McKellar, head of the safety section of the El Segundo refinery of Standard Oil, testified there were approximately 20-21 injuries that resulted from sulfuric acid at the refinery. That as to those areas they feel to be hazardous, they outline them with a yellow line indicating hazardous locations, and they would not allow people to go into those areas unless they had protective equipment.

Colson testified that no one ever told him to put on any protective equipment, or that there was acid in the pipe near where he was working.

We have flyspecked the record and have determined that Colson has cited only the bits and pieces of it that, standing alone, seem to support the allegations of his complaint. The trial record, however, discloses a far different picture. The so-called damaging statements and records, when considered in context, do not prove conduct by Standard Oil that was willful and accompanied by aggravating circumstances amounting to malice. (*Gombos* v. *Ashe,* 158 Cal.App.2d 517, 526-527 [322 P.2d 933].)

We elucidate. Colson's first allegation concerning the leaks is ". . . over fifty leaks in the above-mentioned pipe had been reported to defendant STANDARD OIL . . . and repeated requests had been made by said defendant's Safety Division during that period that said defendant correct the situation and repair the pipe, which requests were refused or ignored by said defendant." The second allegation on this issue was that Standard Oil had failed to make repairs and replacements in order to

keep its facilities operating despite knowledge of the danger. Standard Oil graphically dealt with these issues. It placed into evidence a large diagram (Exhibit A), showing the location and entire length of the 4-inch pipe. Standard Oil's records contained the time and location of each leak in the entire pipe, and the time that the leak was repaired. This information was marked on the diagram. Each leak was repaired immediately, and generally on the same day, or each was temporarily repaired until full repair was made. No evidence was produced to show that the final repair was negligently delayed. All of the leaks except one occurred in a bend, weld, ell, or valve on the line. Only one leak had occurred because of external corrosion on a straight stretch in the pipe other than the break that caused the injury to Colson. No leaks had occurred in the specific section of the pipe where Colson was injured. Several leaks occurred in an area far removed from the rupture causing Colson's accident and there was testimony indicating the pipe in this area should be "run to failure" rather than immediately be replaced. However, after it was repaired, a heavy redwood lining was placed around the line to prevent injury to personnel who might be in the area. This section did have numerous problems and Colson sought to use them to prove his allegations. The evidence shows, however, that Standard Oil quickly dealt with the problems and made repairs in a manner that would protect personnel in case of further leaks.[2] There is no evidence that Standard Oil ran any part of the line "to failure" in utter disregard for the safety of others, or had such a policy.

The next claim of Colson is that Standard Oil disregarded Rasmussen's recommendation to replace the 4-inch line. This is fallacious. Rasmussen's testimony on cross-examination shows Standard Oil decided, after his recommendation, to test the entire line in 1964 using certain testing equipment designed for that purpose.[3] From these tests Standard Oil determined it was unnecessary to replace the entire line but only specified sections, which it did. On the pipe section that ruptured and caused Colson's injury, Rasmussen was asked what the test showed on its life expectancy. He replied that the tests indicated a life expectancy to

---

[2]W. J. Lochmann, an expert on metal corrosion, testifying for Standard Oil, said about this area: "[t]he piping goes up and turns and makes a number of . . . tight bends and this is a tremendous design problem to transport sulfuric acid . . . I think that Standard recognized this problem . . . it appears to me that they've taken good corrective action."

[3]Rasmussen described it as follows: ". . . We used a Pentron to give a general idea of what the condition of the line was to show if there were any areas that showed extreme thinning, to try to pick up on the entire line . . . . Then we went in with an ultrasonic thickness gauge and took readings over the entire length as we have indicated on this exhibit. . ."

1971 (four years after the rupture.) He agreed this was an estimate based on experience only, and that the true life of the pipe cannot be determined with exactness.

Of a similar nature is Colson's charge that Rasmussen recommended (without success) removal of a steam line which ran only 14-16 inches from the 4-inch line. Both Rasmussen and Lochmann testified that Standard Oil followed this recommendation by *relocating the 4-inch line* away from the steam line and in a separate sleeve.

Colson's second allegation concerning the leaks is that Standard Oil failed to make repairs by reason of its desire to keep its facilities operating despite the danger. Again the record proves the contrary. After the 1964 line test, the line was shut down and several lengthy sections were replaced in December of that year. This was done at other times when repairs (especially in the redwood box area) were made. Mr. Bopp, Colson's witness, testified that the plant was shut down to make repairs during the time he was an employee. Mr. Bopp was also asked: "Were you familiar with the safety records of Standard's El Segundo refinery when you were employed there, Mr. Bopp?

"A. Yes I was.

"Q. And in your experience, did you find that the El Segundo refinery had an excellent safety record?

"A. I think in my experience that Standard Oil did have a good safety record, yes.

"Q. And in your experience, they demonstrated a real concern about the safety of personnel working on the El Segundo refinery; isn't that correct Mr. Bopp?

"A. That is correct. I think I said something to that effect in my report, didn't I?"

The third and probably most damaging allegation in Colson's complaint was that 20 or more persons had been injured from leaks caused by corrosion or other physical defects in the 4-inch line. Again, detailed evidence on this issue comes from the records of Standard Oil and is contained in an exhibit (exhibit 13). This exhibit lists every injury from sulfuric acid that occurred at the refinery from 1949 to the date of

Colson's injury. There were 32 sulfuric acid injuries, most of them minor. Only *one* or possibly *two* were caused by a leak on the 4-inch acid line. 30 of the injuries were pinpointed to have occurred on other lines or tanks or installations at different locations at the refinery. An injury in 1964 to a N. Fernadez occurred when an acid line broke, but it is not known which line it was. Of these 30 injuries, 20 were caused by employee negligence or improper procedures. In other words, they were not attributable to corrosion, improper maintenance, or physical defects of the equipment in question. Of the remaining injuries from sulfuric acid, two were caused by small hardware failures (nipples, gauges, etc.), four were valve or valve packing failures, one occurred when a pressure gauge failed, one occurred from a small leak in a tank, one was a leak in an acid regulator, and one was in a catalytic cracking unit.

These injuries covered a span of approximately 18 years. Clearly Colson did not prove that 20 accidents (or any substantial number) resulted from leaks in the 4-inch line as alleged. Of course, sulfuric acid injuries from the other lines and equipment are important in determining if Standard Oil was on notice of the dangers involved; however, the scope of the evidence here could only be a factor in determining the issue of negligence. Standard Oil's El Segundo refinery is a huge installation with over 500 miles of pipelines and 27 miles of roadway surface. During 18 years many maintenance problems will develop in the usual course of operations. Standard Oil's conduct concerning these leaks does not reach the proof necessary (discussed *infra*) to warrant punitive damages.

In *G. D. Searle & Co.* v. *Superior Court,* 49 Cal.App.3d 22 [122 Cal.Rptr. 218], Justice Friedman on page 29 states: "[I]t is necessary to observe the elements of the malice which justifies an exemplary award. At this point one discovers a plethora of appellate elucidations. California courts have indulged in a profusion of pejorative terms to describe malice. A survey reveals several separate and somewhat divergent currents of California case law." Division I of this court in its opinion, after citing Civil Code section 3294,[4] relied primarily on language found in *Reuther* v. *Viall, supra,* 62 Cal.2d 470, 475. It then said that Colson must prove Standard Oil knew or should have known the conditions of the premises were *unreasonably* dangerous to personnel

---

[4]Civil Code, section 3294, reads as follows: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

and *highly probable* and Standard Oil's acts and omissions were *wilful and wanton* and done with a wanton and reckless disregard of probable harm to Colson. After reading all of the testimony in this case and viewing the exhibits filed with the appeal we conclude Colson's proof falls far short, as a matter of law, of meeting the above punitive damage requirements. At most his evidence only points to possible negligence on the part of Standard Oil (an issue conceded by it).[5] Standard Oil expeditiously repaired all leaks, and completely tested the entire line in 1964. This led to major replacements in the line in December of that year. The most troublesome area was encased in redwood—a proper procedure—for protection of personnel. There is no evidence of wilful and wanton acts or omissions by Standard Oil that would cause probable harm to Colson or others. We are fully aware of the law governing the granting of a motion for a directed verdict.[6] There was no evidence of sufficient substantiality to support a punitive damage verdict against Standard Oil.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

---

[5]We have not replied to all of Colson's allegations of proof, namely Standard Oil's failure to warn Colson, give him protective clothing or mark the area with warning paint, plus a few others, because they also point only to possible negligence. Personnel normally would not have been in the area of the break—the fact that Colson was, was unfortunate but highly coincidental.

[6]A nonsuit or a directed verdict may be granted " 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " (*Newson* v. *Hawley*, 205 Cal. 188 [270 P. 364].)