[Civ. No. 54985. Second Dist., Div. Four. July 24, 1979.]

IRIS NOLIN, Plaintiff and Respondent, v.
NATIONAL CONVENIENCE STORES, INC.,
Defendant and Appellant.

**COUNSEL**

Vletas & Greer, Gus Vletas and Barry E. Shanley for Defendant and Appellant.

Lerer & Hobart, Roger A. Kander and G. Dana Hobart for Plaintiff and Respondent.

**OPINION**

**JEFFERSON (Bernard), J.**—This is an action for damages for negligence. Plaintiff, Iris Nolin, by a second amended complaint, sought damages sustained by her in a slip-and-fall accident on the premises of defendant, National Convenience Stores, Inc., a Texas corporation doing business as Stop 'N' Go Markets. The first cause of action of plaintiff's complaint was directed toward the recovery of compensatory damages. The second cause of action requested punitive damages on the basis that defendant's "reckless, wanton, and intentional misconduct . . . [and its] callous and conscious disregard for [her] safety. . . ." had caused plaintiff injury.[1]

Trial was by jury. The trial judge, having determined that there was sufficient evidence to warrant such instruction, instructed the jury concerning punitive damages.

Plaintiff was awarded total compensatory damages of $68,101, reduced by 10 percent—the percentage found by the jury to be plaintiff's comparative fault—to a net recovery of $61,291. In addition, plaintiff was awarded $50,000 in punitive damages—making a total recovery of $111,291.

---

[1] A claim for punitive damages is authorized by Civil Code section 3294, which provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

Defendant National has appealed from the judgment on the ground that there was insufficient evidence to support the giving of an instruction on punitive damages to the jury, contending that, as a matter of law, defendant's conduct did not meet the criteria set forth in Civil Code section 3294 of "oppression, fraud, or malice."[2]

I

*A Summary of the Evidence*

There is no dispute that plaintiff slipped and fell toward dusk on November 13, 1974, at a Stop 'N' Go store owned by defendant in Long Beach. Plaintiff claimed that she lost her footing due to the presence of foreign substances on the ground—oil and gasoline, primarily—near the self-service gasoline pumps located on the premises. The fall occurred after plaintiff had filled the tank of her automobile with gasoline from the self-service pumps. She sustained a badly fractured ankle, and, as a result, is permanently disabled.

What was of critical importance below was the evidence adduced concerning the circumstances surrounding plaintiff's fall. It was plaintiff's contention, accepted by the jury, that defendant National had so carelessly maintained the area surrounding its self-service gasoline pumps that it had displayed a conscious disregard for the safety of its customers.

We summarize next the evidence adduced on this point, bearing in mind that "[i]n resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment [citation]. All issues of credibility are likewise within the province of the trier of fact. . . . All conflicts, therefore, must be resolved in favor of the respondent [the prevailing party]." (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

Much of the testimony concerning the operation of defendant's Stop 'N' Go market was provided by former employees of defendant corporation, which operated eight stores in the Long Beach area.

---

[2]The instruction on punitive damages actually given the jury has not been included in the designated record on appeal. However, defendant does not claim here that the instruction as given was erroneous, but rather that it should not have been given at all. Nor does defendant claim that the award of $50,000 punitive damages was excessive and the result of passion and prejudice on the part of the jury.

At the subject store where plaintiff's accident occurred, two self-service gasoline pumps had been installed in December 1973. A problem of maintenance developed within the four- or five-month period before plaintiff fell due to the defective condition of a nozzle on one of the pumps. When in use, the nozzle would overflow, spilling gasoline on the pump apron and sometimes on customers filling their tanks. Defendant's mechanical maintenance supervisor denied at trial that he had ever been informed of this problem, although store employees declared that they had requested repairs of the nozzle many times.

Defendant's district representative, Watson, charged with responsibility for the smooth operation of defendant's stores in the area, often visited the premises and admitted in his deposition that he was aware of the overflowing nozzle, having been informed of it many times.

The manager of the subject store, Larson, was concerned about the overflowing gasoline because of the fire hazard and the danger of slips and falls by patrons. Larson mentioned to supervisor Watson that there had been two separate incidents where people had fallen around the pumps prior to plaintiff's accident in November 1974. Watson, according to Larson, had dismissed the possibility of successful negligence suits against defendant by stating that "the store didn't have anything to worry about because they had a team of lawyers that would tie it up in court for years." Company invoices introduced at trial established that an attempt had been made to repair the nozzle in July 1974; but that attempt was apparently unsuccessful, as the pump continued to malfunction even after plaintiff's accident.

Gasoline was not the only substance which regularly spilled around the pumps. The store sold motor oil by the can—oil that patrons would attempt to pour into their vehicles on the premises. Since the store provided no method for either opening the oil cans or for draining the cans into customer vehicles, customers would borrow ordinary can openers from store clerks for this purpose and, on occasion, would fashion makeshift funnels to transfer the oil from the can to their automobile engines. Empty oil cans and oil spills were often in evidence around the pumps.

Defendant gave no preemployment or in-service training to employees concerning cleanup procedure. The subject store was manned by three employees, each working an eight-hour shift alone as the store was open on a twenty-four hour basis. It was company policy that the employee on

duty was not to leave the store during his shift when customers were present inside. On the "graveyard" shift, in the late evening and early morning hours, the employee on duty was expected, if there was time, to clean up outside the store, including the pump area. The testimony was somewhat divergent concerning the frequency of cleanup; it apparently varied according to which employee was on duty. There was a hosing down of the area about once a week, and sometimes sweeping up in between times, but defendant did not provide any solvents or particular cleaning materials for the task.

The result was that the pump area constituted a continuing peril to all who ventured there. This danger was compounded by the fact that, at night, the lighting was very poor. Witnesses testified that, prior to plaintiff's accident, two members of the public had fallen there as well as several of defendant's own employees.

Manager Larson testified that when it became clear that a dangerous condition existed, and that her warnings to supervisor Watson went unheeded, she unilaterally advised the employees under her supervision to place warning signs on the pumps. Supervisor Watson, however, insisted that the signs be removed as damaging to the store's "image," because of their makeshift nature, although he also refused Larson's request for an officially approved printed sign. In addition, at Larson's suggestion, store clerks advised patrons over the loud speaker system of the hazards around the pumps; but supervisor Watson ordered that this practice be terminated.

As indicated previously, plaintiff's fall occurred near nightfall, when the lighting was very poor. She had just replaced the gas cap on her tank at the rear of her vehicle and observed nothing on the ground prior to the accident. After she fell, however, she observed a puddle of oil about one and one-half feet in diameter located partially under the rear of her vehicle; she also noticed a strong smell of gasoline on her clothing.

## II

### The Right to Recover Punitive Damages in an Action Founded on Negligence

Traditionally, the law has not favored the imposition of punitive damages. Thus, it has been said that "[t]hey are not a favorite of the law and the granting of them should be done with the greatest caution. They

are only allowed in the clearest of cases." (*Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 526 [322 P.2d 933].) The statutory authorization for punitive damages is found in Civil Code section 3294 which provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

In the case at bench—an unintentional tort action—we are dealing with "malice," one of the trilogy of conditions—"oppression, fraud, or malice"—set forth in Civil Code section 3294 to justify an award of punitive damages. In an early case, *Davis* v. *Hearst* (1911) 160 Cal. 143 [116 P. 530], the Supreme Court emphasized that the malice intended by section 3294 to justify an award of punitive damages referred to "the motive and willingness to vex, harass, annoy, or injure" (*id.* at p. 162), and that it is only upon a showing adequate to establish this meaning of malice "that punitive damages have ever been awarded." (*Id.,* at p. 162.)

It has been suggested that the *Davis* v. *Hearst* formulation of the concept of "malice" is not troublesome as long as plaintiff is charging a defendant with an intentional tort rather than an unintentional tort. (*G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 30 [122 Cal.Rptr. 218].) The *Searle* court points out that a less stringent standard for an award of punitive damages than that set forth in *Davis* v. *Hearst* has emerged in some of the decisional law. The *Searle* court refers to "wanton and reckless misconduct" standard set forth in a dictum in *Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869-703 [118 P.2d 465], as an instance of a less stringent standard.

In a thoughtful and well considered opinion, the *Searle* court presents an extended discussion of the verbalisms and semantic distinctions which abound in California case law on this subject; the *Searle* court concluded that one reason for the difficulty of definition encountered is that what may be adequate in one field of tort law, such as libel, is not equally satisfactory when applied in a products liability case. *Searle* concludes that "[t]he central spirit of the exemplary damage statute, the demand for evil motive, is violated by an award founded upon recklessness alone." (*Searle, supra,* 49 Cal.App.3d 22, 32.)

██ It has long been the rule that conduct classified only as unintentional carelessness, while it may constitute negligence or even gross

negligence, will not support an award of punitive damages. But the *Donnelly* court is careful to point out that a nonintentional tort can have the characteristics of an intentional tort to the extent of embracing the concept of malice as used in Civil Code section 3294. Thus, the *Donnelly* court observed: "A tort having some of the characteristics of both negligence and willfulness occurs when a person with no intent to cause harm *intentionally* performs an act so unreasonable and dangerous that he knows, or should know, it is highly probable that harm will result. [Citation.] Such a tort . . . is most accurately designated as *wanton and reckless misconduct.* It involves no intention, as does willful misconduct, to do harm, and it differs from negligence in that it does involve an intention to perform an act that the actor knows, or should know, will very probably cause harm. [Citations.] Wanton and reckless misconduct is more closely akin to willful misconduct than to negligence, and it has most of the legal consequences of willful misconduct. Thus, it justifies an award of punitive damages, . . ." (*Donnelly, supra,* 18 Cal.2d 863, 869-870.) (Italics added.)

It is clear, therefore, that *Donnelly's* "wanton and reckless misconduct" standard for justifying an award of punitive damages in the case of an unintentional tort does not, as suggested by *Searle,* do violence to the requirement for "evil motive" announced in *Davis* v. *Hearst.* Nor does the "wanton and reckless misconduct" definition of malice authorize an award of punitive damages for "recklessness" alone. The "evil motive" for malice is found in "an *intention* to perform an act that the actor *knows,* or *should know,* will very probably cause harm." (*Donnelly, supra,* 18 Cal.2d 863, 869.) (Italics added.)

The *Donnelly* concept of wanton and reckless misconduct has also been described as a defendant's conduct which constitutes "a conscious disregard of the plaintiff's rights" (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103]) or a "conscious disregard of the safety of others." (*Searle, supra,* 49 Cal.App.3d 22, 32.) ■ It is of little consequence which of these various phrases is used to define malice for an unintentional tort. They all have the same meaning in announcing a rule of law that authorizes an award of punitive damages for a nonintentional tort where defendant's conduct which causes injury is of such severity or shocking character that it warrants the same treatment as that accorded to willful misconduct—conduct in which the defendant intends to cause harm.

Assessment of a defendant's conduct in light of the conscious-disregard-of-safety standard suggested in *Searle* was undertaken by the court in *Seimon* v. *Southern Pac. Transportation Co.* (1977) 67 Cal.App.3d 600, 607 [136 Cal.Rptr. 787]. Plaintiff was injured at a particularly dangerous railroad crossing maintained by defendant railroad. As the *Seimon* court explained, "[t]he record is replete with evidence pointing to the peculiarly dangerous character of the . . . crossing." In addition, it had been established that defendant knew of the danger and did nothing to alleviate it; there were no warning devices at the crossing to alert southbound drivers that a train might be approaching. The court concluded that "more than just benign neglect" was involved, but that a jury could conclude that "defendant had displayed a conscious and callous indifference to, or disregard of, probable harm to motorists. . . ." (*Id.,* at p. 609.) Thus, *Seimon* was returned to the trial court for jury determination of the issue of punitive damages.

As the record before us makes clear, the trial judge in the case at bench relied heavily on *Seimon* in determining to instruct the jury on punitive damages. Defendant argues here, however, that, in terms of evidentiary sufficiency, the instant case more nearly resembles another recent Court of Appeal case, *Colson* v. *Standard Oil Co.* (1976) 60 Cal.App.3d 913 [131 Cal.Rptr. 895], which affirmed a trial court's directed verdict for defendant on the issue of punitive damages. In *Colson,* plaintiff was injured on defendant's premises by sulfuric acid which leaked from a corroded pipe. The *Colson* plaintiff claimed that defendant's failure to properly maintain the pipe constituted a conscious disregard for the safety of others. The *Colson* case is instructive here because it reveals the type of evidence a defendant may successfully introduce to negate the charge of callous indifference. The Colson record contained substantial, if not overwhelming, evidence that plaintiff's claim was inflated and that defendant had made reasonable efforts to maintain the acid-carrying pipes in good condition on a continuous basis. The *Colson* case, therefore, is not particularly helpful to defendant herein, who did not, and possibly could not, produce the type of evidence which would have persuaded the jury that defendant had not displayed the knowing disregard for safety that plaintiff claimed to be the case.

It must be recognized that a claim for punitive damages may arise in many varying factual contexts, as many as may be presented in the law of torts. Both plaintiff and defendant have argued their position here by dissecting the factual background of *Seimon* and *Colson* in the hope of finding persuasive similarities. However, such efforts are not particularly

productive; each case where punitive damages are claimed must be adjudged on individual merit, bearing in mind the general principles set forth in the decisional law. An instructive example is found in the case of *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798 [142 Cal.Rptr. 487]. There, a plaintiff's complaint seeking punitive damages was held to be immune from attack by demurrer. The plaintiff alleged that defendant corporation had induced her to rent one of their apartments by representations that the apartments were safe and protected by safety patrols operated by defendant's agents, knowing that, in fact, several rapes had occurred on defendant's premises and that few, if any, safety precautions had been taken. Plaintiff was raped; the case was returned for trial upon the issue, among others, of defendant corporation's liability for punitive damages.

██ In the case at bench, we find the evidence amply sufficient to justify the jury's determination of malice and an award of punitive damages. As *Seimon* tells us, "[m]ost often this element is proven by circumstantial evidence alone." (*Seimon, supra,* 67 Cal.App.3d 600, 607.) Here there was considerable evidence, both direct and circumstantial, that a very dangerous condition existed around defendant's gas pumps; there was a dual peril to both customers and employees of fire and slipping and falling.

Defendant's established inattention to the danger showed a complete lack of concern regarding the harmful potential—the probability and likelihood of injury. The entire nature of defendant's operation, as it was presented to the jury, reflected defendant's overriding concern for a minimum-expense operation, regardless of the peril involved. This concern was evidenced by the method of deployment of clerks, the absence of maintenance personnel, and the absence of necessary equipment for handling oil sold to customers. The evidence also established that the employees who observed the danger daily communicated it upward to supervisory personnel, but to no avail.

III

*Corporate Liability for Punitive Damages Is*
*Made Dependent Upon Level of Responsibility*
*of Employee Whose Conduct Is Involved*

Defendant corporation urges here that it cannot be held accountable for any misconduct on the part of minor employees, insofar as punitive

damages are concerned. The evidence established that the store where plaintiff was injured was supervised by defendant's employee, Watson, who had been given the power and the responsibility for conveying corporate policy down through the echelons.

■ "California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can properly be awarded against a principal because of an act by an agent if, but only if '(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed *in a managerial capacity* and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act.' " (*Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 691 [117 Cal.Rptr. 146] (Italics added).)

■ It could reasonably be inferred from the evidence that Watson, in his disregard of the dangerous condition, and his routine decisions forbidding warnings to the public, was accurately conveying company policy in his managerial position. It may well be that Watson's cavalier reference to the ability of defendant's lawyers to successfully delay any day of reckoning occasioned by injuries to members of the public was also a reflection of defendant's primary interest in conducting a low-cost operation irrespective of consequences. Such a reference reflected a lack of concern for safety—conduct in and of itself an expression of evil motive, i.e., actual malice. But we are not confined to this single item of evidence. The entire record discloses, on the part of defendant's personnel at the managerial level, a conscious disregard for safety that constitutes the ingredient of malice—an evil motive.

We necessarily reject, therefore, defendant's sole contention—that the evidence was insufficient, as a matter of law, to justify the trial judge's instruction on the issue of punitive damages and the jury's award of punitive damages.

The judgment is affirmed.

Kingsley, Acting P. J., and Alarcon, J., concurred.

A petition for a rehearing was denied August 16, 1979, and appellant's petition for a hearing by the Supreme Court was denied October 18, 1979. Mosk, J., Clark, J., and Richardson, J., were of the opinion that the petition should be granted.