95 Cal.Rptr.2d 142 (2000)
80 Cal.App.4th 245
Dacus Wade ALLEN, Plaintiff and Appellant,
v.
SULLY-MILLER CONTRACTING COMPANY, Defendant and Respondent.
No. B127946.
Court of Appeal, Second District, Division Seven.
April 26, 2000.
As Modified on Denial of Rehearing May 23, 2000.
Review Granted July 12, 2000.
*143 Greg W. Garrotto, Los Angeles, for Plaintiff and Appellant.
Kirtland & Packard and Robert A. Muhlbach, Los Angeles, for Defendant and Respondent.
JOHNSON, J.
This case presents the question whether an uninsured motorist is barred by Civil Code section 3333.4 from claiming pain and suffering damages in an action for premises liability against a private construction company. In Hodges v. Superior Court (1999) 21 Cal.4th 109, 86 Cal.Rptr.2d 884, 980 P.2d 433 our Supreme Court held the statutory provision did not apply in a products liability action against a car manufacturer to bar an uninsured motorist from claiming pain and suffering damages. We find the Hodges court's analysis of the application and scope of the statute applicable to the factual situation in the case at bar. Accordingly, we hold the trial court erred in ruling the injured uninsured motorist was barred from presenting evidence of general damages and reverse the judgment.

FACTS AND PROCEEDINGS BELOW
In 1996 the City of Los Angeles awarded a contract to defendant and respondent Sully-Miller Contracting Company (Sully-Miller) to perform road construction on Bundy Drive. Construction under the contract included widening the street and installing storm drains, a sewer system, traffic signals and street lights. Sully-Miller entered into a subcontract with Daniel Lopez Concrete Construction to provide concrete work. Part of the subcontract for concrete work included pouring a portion of the road nearest the curb line with concrete surfaces for use as bus stops. This particular concrete surface is commonly known as a "bus pad." A "bus pad" is approximately 80 feet long and 12 to 13 feet wide.
*144 Daniel Lopez Concrete Construction installed one of the concrete "bus pads" on Bundy Drive at the corner of Santa Monica Boulevard. This particular "bus pad" was not installed flush with the asphalt surface of the street. At some points along the pad the concrete was above level of the adjacent asphalt approximately an inch. At other points along the padand specifically on the edge nearest the intersection of Santa Monica Boulevard and Bundy Drivethe bus pad had a height differential of approximately three inches above the road surface.
In situations where there is a height differential, delineators and barricades are used to notify motorists and pedestrians of the danger in order to prevent injury.
As the prime contractor, Sully-Miller was responsible for traffic control during the construction. Its responsibility for traffic control included the installation and maintenance of road barriers, traffic cones and delineators to mark ditches, trenches, uneven road surfaces and the like, in order to protect motorists and pedestrians from injury. Normal procedure for Sully-Miller was for the foreman to check that all traffic control, safety barricades and delineators were in place before leaving for the day. Sully-Miller personnel would check the safety and traffic control markers the next morning at 7 a.m.
A project inspector for the City of Los Angeles was physically present at the construction site five days a week. The city's project inspector oversaw the construction progress and was responsible for ensuring Sully-Miller performed all aspects of the contract as agreed. If the city project inspector saw a problem he would verbally warn the on-site Sully-Miller foreman. If the verbal warning was ineffective, or if the problem posed a serious safety problem, the city's project inspector would issue a written notice of noncompliance.
On three occasions prior to the accident in this case the Los Angeles city project inspector had issued three written warnings regarding deficiencies in Sully-Miller's compliance with its traffic control plan. The warnings concerned the lack of barriers and delineators in locations necessary to protect vehicular and pedestrian traffic and directed broken or destroyed delineators and barricades be replaced. In each instance Sully-Miller corrected the deficiencies the next day. The last written notice of noncompliance the city issued to Sully-Miller was in February 1996.
On August 13, 1996, plaintiff and appellant Dacus Wade Allen was injured in a single vehicle accident as he attempted to make a right hand turn across the elevated concrete bus pad at the intersection of Santa Monica Boulevard and Bundy Drive. Apparently the front tire of his motorcycle caught on a three-inch raised lip of the concrete pad. His motorcycle slipped out from under him and fell onto his knee, causing injury.
In March 1997, Allen brought a personal injury and premises liability action against Sully-Miller, Daniel Lopez Concrete Construction and the City of Los Angeles. On the day scheduled for trial the defendants sought an order barring Allen from presenting evidence of general damages based on his admission he did not have automobile liability insurance at the time of the accident. The trial court noted it was likely not the electorate's intention when passing Proposition 213 to limit general damages for uninsured motorists in this context. It nevertheless found the language of Civil Code section 3333.4 broad enough to bar pain and suffering damages for any uninsured motorist in any situation arising from the use or operation of a motor vehicle. The trial court granted the defendants' motion to preclude Allen from presenting evidence of his noneconomic damages. The court stated it was basing its ruling on the statutory language and not on its rationale.
At the close of Allen's evidence the trial court granted a nonsuit in favor of Lopez Concrete Construction. The jury returned a defense verdict in favor of the City of *145 Los Angeles.[1] However, it found Sully-Miller liable and awarded Allen $20,480 in medical expenses and $3,600 in lost earnings. Allen moved for new trial on the ground the court's ruling barring evidence of general damages constituted an error in law. (Code Civ. Proc., § 657, subd. (7).) The trial court denied the motion for new trial and entered judgment on the jury verdict.
Allen appeals to assert error in the trial court's ruling to the extent it affects the judgment against respondent Sully-Miller.

DISCUSSION

I. A PREMISES LIABILITY CLAIM AGAINST A PRIVATE COMPANY FALLS OUTSIDE THE SCOPE OF CIVIL CODE SECTION 3333.1

Civil Code section 3333.4 was enacted as part of the Personal Responsibility Act of 1996, or Proposition 213, approved by the voters in November 1996. As relevant here it provides: "(a) ... [I]n any action to recover damages arising out of the operation or use of a motor vehicle, a person shall not recover non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement, and other nonpecuniary damages if any of the following applies:
".........................
"(2) The injured person was the owner of a vehicle involved in the accident and the vehicle was not insured as required by the financial responsibility laws of this state.
"(3) The injured person was the operator of a vehicle involved in the accident and the operator can not establish his or her financial responsibility as required by the financial responsibility laws of this state."[2]
The primary question in this appeal is whether the statute precludes an uninsured motorist from recovering damages for pain and suffering in a premises liability action against a private company.
The trial court concluded the statutory language was broad enough to preclude any uninsured motorist from recovering such damages in any action arising out of any use of a motor vehicle in any context. On the other hand, the trial court acknowledged the electorate likely did not envision its application to the factual situation presented in the case at bar. In reviewing the materials the electorate relied on in passing Proposition 213 our state's highest court has since concurred in the trial court's latter assessment of the statute's proper scope.
In Hodges v. Superior Court, supra, 21 Cal.4th 109, 86 Cal.Rptr.2d 884, 980 P.2d 433 an uninsured motorist was driving a borrowed Mustang. The Mustang was not insured. The driver also did not have automobile insurance. The Mustang stalled on the freeway and was struck from the rear by another car driving at high speed. The gas tank of the Mustang located in the trunk ruptured and caused an explosion. The driver's seat collapsed and momentarily trapped Hodges inside the car. Hodges suffered injuries, including second and third degree burns over 26 percent of his body. (Hodges v. Superior Court, supra, 21 Cal.4th at p. 112, 86 Cal. Rptr.2d 884, 980 P.2d 433.)
*146 Hodges brought an action against Ford Motor Company for personal injury, alleging the Mustang's gas tank was defective in design. His complaint sought both compensatory and punitive damages. Ford Motor Company moved for summary adjudication on the ground, among others, Hodges was an uninsured motorist and was therefore barred under Civil Code section 3333.4 from recovering either noneconomic or punitive damages. The trial court ruled Civil Code section 3333.4 barred Hodges from recovering noneconomic and nonpecuniary damages because it was undisputed he was uninsured and operating an uninsured vehicle at the time he was injured in the accident.
The Supreme Court found the trial court erred. In reviewing the ballot materials before the electorate our Supreme Court concluded Proposition 213 was not intended to apply in a products liability action against a car manufactureralthough the statutory language itself seemed sufficiently broad to encompass that situation as well. The court noted the meaning of the phrase "any action to recover damages arising out of the operation or use of a motor vehicle" was neither clear nor obvious. (Hodges v. Superior Court, supra, 21 Cal.4th at p. 113, 86 Cal.Rptr.2d 884, 980 P.2d 433.) To interpret the statute in the way the electorate intended the court looked to the overall purpose of the proposition in the ballot arguments and elsewhere to determine the proper scope of the initiative measure.
The materials the Hodges court reviewed and the court's analysis of those materials are equally applicable to the issue presented in the present case. We thus quote extensively from the relevant portions of the Hodges court's opinion explaining the purpose of Proposition 213 and proper scope of the resulting statutory provision.
"It seems clear that a primary aim of the Proposition 213, as relevant here, was to limit automobile insurance claims by uninsured motorists. The electorate wanted to ensure that uninsured motorists, who contribute nothing to the insurance pool, would be restricted in what they receive from it. This principle of fairness fueled the initiative. The right to recover fully for an injury caused by a design defect, even by an uninsured motorist, has no bearing on any principle of fairness having to do with the financial responsibility laws. It is not clear that anyoneeither the sponsors of the measure or the voters intended to protect from products liability claims manufacturers who do not contribute to that pool and whose other insurance rates are not affected by the existence of uninsured motorists.
"Proposition 213's statement of legislative purpose supports this view, identifying the principal intended beneficiaries of the measure as Californians who obey the financial responsibility laws. Thus, section 2 states the following `Findings and Declaration of Purpose': `(a) Insurance costs have skyrocketed for those Californians who have taken responsibility for their actions. Uninsured motorists ... are law breakers and should not be rewarded for their irresponsibility and law breaking. However, under current laws, uninsured motorists ... are able to recover unreasonable damages from law-abiding citizens as a result of ... accidents .... [¶] (b) Californians must change the system that rewards individuals who fail to take essential personal responsibility to prevent them from seeking unreasonable damages or from suing law-abiding citizens. [¶] (c) Therefore, the People of the State of California do hereby enact this measure to restore balance to our justice system by limiting the right to sue of ... uninsured motorists.' (Ballot Pamp., text of Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 102.)
"With regard to uninsured motorists, the `system' in need of change in order to `restore balance to our justice system' is the one that permits those who do not contribute to the insurance pooland thereby drive up the costs of premiums for *147 automobile insuranceto reap the benefits of the coverage paid for by law-abiding motorists. There is no suggestion that the proposed law would also change the `system' with regard to products liability claims, or that any such change is needed. Moreover, use of the words `Californians' and `law-abiding citizens' indicates that the initiative was aimed principally at providing balance for those who obey the financial responsibility laws, not benefiting manufacturers whose design and manufacturing processes are not subject to those laws.
"Proposition 213's summary of arguments `pro' and `con' also indicates that the statute was primarily intended to limit awards against insured drivers. It explains: `A yes vote on this measure means: ... uninsured motorists involved in collisions could recover only medical and out-of-pocket expenses but would be prohibited from recovering "pain and suffering" awards from insured drivers.' (Ballot Pamp., summary of arguments for and against ballot measures, as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 7, second italics added.) It summarizes the arguments against the measure as follows: `[T]he Insurance Lobby's newest No-Fault scheme rewards reckless drivers who hit innocent poor people. Proposition 213 lets reckless drivers avoid responsibility. No-Fault for reckless drivers. The No-Faulters say we save millions. But nothing in Proposition 213 No-Fault lowers our insurance rates.' (Ibid.)
"The ballot arguments, considered as a whole, similarly indicate that voters were being urged to distinguish between law-abiding motorists who pay for liability insurance, on the one hand, and law-breaking uninsured motorists who refuse to pay for such insurance, on the other. By limiting the amount of damages available to uninsured motorists, the law-abiding motorists would receive some savings in the form of reduced premiums. The arguments for and against the measure refer principally to remedying an imbalance in the justice system that resulted in unfairness when an accident occurred between two motorists one insured and the other not. There is no suggestion that it was intended to apply in the case of a vehicle design defect.
"The ballot arguments thus emphasize that Proposition 213 was designed primarily for the benefit of `law-abiding citizens' i.e., drivers who obey the financial responsibility laws: `[Uninsured motorists can sue law-abiding citizens for huge monetary awards in addition to being compensated for medical and other expenses, [¶] These huge awards cost Californians who play by the rules and obey the law $327 million every year! That's not fair!' (Ballot Pamp., argument in favor of Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 50.) `Law-abiding drivers pay additional premiums to protect themselves from uninsured drivers. Eliminating huge monetary awards for irresponsible drivers will save $327 million each year!' (Id., rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 51.)
"It is true that the ballot arguments also demonstrate that the measure was intended to punish and deter scofflaws, i.e., drivers who do not obey the financial responsibility laws. By imposing heavy costs on disobeying the law, it would create an economic incentive for drivers to obey the law and to hold accountable those who do not. (See Yoshioka v. Superior Court (1997) 58 Cal.App.4th 972, 983, 68 Cal.Rptr.2d 553 [describing the purposes of Proposition 213 as including `increasing the costs of ... disobeying California's Financial Responsibility Law' and `avoiding unreasonable damages being awarded to the uninsured'].) Thus, proponents of the measure argued: `PROPOSITION 213 SAYS PEOPLE WHO BREAK THE LAW SHOULD NOT BE REWARDED, WHILE LAW ABIDING CITIZENS PICK UP THE TAB. [¶] Law-abiding citizens already pay higher insurance premiums to cover uninsured motorists. Law-abiding citizens *148 should not be punished for living responsibly! The system needs to be fixed. Illegal behavior shouldn't be rewarded. People who break the law must be held accountable for their actions. [¶] ... [¶] STOP LAWBREAKERS FROM PROFITING FROM THEIR CRIMES. [¶] VOTE YES FOR PERSONAL RESPONSIBILITY.' (Ballot Pamp., argument in favor of Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 50, italics and all capitals in original.) The rebuttal to the argument against the initiative measure, similarly, urges: `PROPOSITION 213 REFORMS AN UNFAIR SYSTEM THAT REWARDS LAWBREAKERS AND PUNISHES THOSE WHO PLAY BY THE RULES. [¶] ... [¶] VOTE YES FOR PERSONAL RESPONSIBILITY.' (Id., rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 51, all capitals in original.)
"But the express goal of the initiative statute was restoring balance to the system, not simple retribution. Its stated purposes of punishing illegal behavior and encouraging personal responsibility are emphatically directed at `reform[ing] an unfair system' with respect to law-abiding drivers who `pick up the tab'i.e., those who `play by the rules' and take `personal responsibility' (Ballot Pamp., argument in favor of Prop. 213 and rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at pp. 50, 51) but have been required to `pay additional premiums to protect themselves from uninsured drivers' (id., rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 51). There is no suggestion that such punishment or incentive was also intendedor should be permittedto benefit manufacturers of defective vehicles, which are not reasonably included among `those who play by the rules' or `take personal responsibility' or `pick up the tab' for the `sky-rocket[ing]' costs of automobile insurance. Thus, although it might theoretically also punish illegal behavior to limit recovery against all tortfeasors, neither the statutory language nor the ballot materials reflect an intent to reform a system `unfair' to law-abiding insured motorists by providing a windfall to manufacturers of defective vehicles.
"Indeed, such a windfall would appear inconsistent with the long-standing public policy goal of requiring manufacturers to bear the costs of injuries from defective products. (See Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 377 P.2d 897.) As Insurance Commissioner Chuck Quackenbush, a proponent of Proposition 213, urges in an amicus curiae letter: `California motorists have a vital and ongoing interest in deterring manufacturers from shipping dangerous and unsafe products into California and in fairly compensating persons injured by defective products. That interest would not be well served by applying Proposition 213 to product liability claims.' Nor does limiting damages against manufacturers of dangerous vehicles, which do not contribute to the insurance pool, appear to serve the core purpose of Proposition 213 of restoring balance to the insurance system by reinforcing the financial responsibility laws.
"Nothing in the legislative history of the initiative suggests that the voters intended that result. In the absence of a clear expression of such intent, we decline to adopt a broad literal interpretation of the initiative that would raise such `substantial policy concerns.' (Calatayud v. State of California (1998) 18 Cal.4th 1057, 1068 [77 Cal.Rptr.2d 202, 959 P.2d 360].)" (Hodges v. Superior Court, supra, 21 Cal.4th at pp. 115-118, 86 Cal.Rptr.2d 884, 980 P.2d 433, italics in original, footnotes omitted; see also Horwich v. Superior Court (1999) 21 Cal.4th 272, 276, 87 Cal.Rptr.2d 222, 980 P.2d 927 [holding defendants could not assert Civil Code section 3333.4 as a defense to noneconomic damages in a wrongful death action brought by an uninsured motorist's parents because the statute only *149 bars recovery by the uninsured injured person].)
If the statute does not apply in an action by an uninsured motorist against a private company for products liability, then by parity of reasoning it does not apply to an action by an uninsured motorist against a private company for premises liability. In neither case are the defendants insured drivers involved in the injury causing accident. Moreover, in neither case will the defendants' automobile insurance rates be affected. Contrary to Sully-Miller's suggestion, Proposition 213 is no more a defense to liability for noneconomic damages in this case because Sully-Miller contributes to the comprehensive liability insurance pool than it was for the Ford Motor Company in Hodges. In other words, these types of claims against these types of defendants have no bearing on any of the goals furthered by Proposition 213to lower the cost of mandatory car insurance and to restore balance to the justice system. (Yoshioka v. Superior Court (1997) 58 Cal.App.4th 972, 978, 68 Cal.Rptr.2d 553.)
Moreover, the court's analysis of the controlling ballot materials and proponent statements applies with equal force to the case at bar. The right to recover fully for an injury caused by a dangerous condition on property, even by an uninsured motorist, does not implicate any principle of fairness in applying the financial responsibility laws. There is no indication either the electorate or the sponsors of Proposition 213 intended to protect from premises liability claims road construction companies who do not contribute to the automobile insurance pool and whose other insurance rates are not affected by the existence of uninsured motorists. The ballot materials do not indicate Proposition 213 intended to change the "system" with regard to a private company's liability for dangerous conditions on property, or that any such change is needed.
Nor do the ballot materials reflect any intention to benefit persons who maintain dangerous conditions on premises. Such persons or entities cannot be reasonably considered among those who "play by the rules" or "take personal responsibility" or "pick up the tab" for the "skyrocket[ing] costs" of automobile insurance. There is nothing in either the ballot materials or statutory language to suggest an intention to reform a system unfair to law-abiding insured motorists by providing a windfall to private companies who maintain dangerous conditions on premises accessible to the motoring public.
Indeed, providing a windfall to this sort of tortfeasor would appear inconsistent with the long-standing public policy goal of requiring private persons and private entities who maintain dangerous conditions on property to bear the costs of injuries from their negligent behavior. (See Rowland v. Christian (1968) 69 Cal.2d 108, 70 Cal. Rptr. 97, 443 P.2d 561.)
Based on the foregoing reasons we conclude the trial court erred in ruling Civil Code section 3333.4 applied in this premises liability action to preclude Allen from presenting evidence of his noneconomic damages. Because there is no way to determine how the omitted evidence may have affected the judgment, we reverse and remand for new trial to permit Allen to present evidence of his noneconomic damages.[3]
Although not strictly necessary to our decision, for guidance on remand we address Allen's contention the trial court erred in denying his request to amend his pleading to add a claim for punitive damages *150 based on a theory of an alleged conscious disregard for the safety of others.

II. THE TRIAL COURT DID NOT ERR IN DENYING ALLEN'S REQUEST TO AMEND HIS COMPLAINT TO ADD A CLAIM FOR PUNITIVE DAMAGES BASED ON ALLEGED EVIDENCE OF A CONSCIOUS DISREGARD FOR THE SAFETY OF OTHERS.

At the close of the evidence Allen made a motion to amend his complaint to add a prayer for punitive damages. Based on the testimony of Sully-Miller's superintendent, Allen argued there was sufficient evidence of a conscious disregard of the safety of others to warrant instructions on punitive damages. (Citing Nolin v. National Convenience Stores, Inc. (1979) 95 Cal.App.3d 279, 157 Cal.Rptr. 32 and Seimon v. Southern Pacific Transportation Co. (1977) 67 Cal.App.3d 600, 136 Cal.Rptr. 787.) The trial court disagreed and denied Allen's motion to amend and further denied his request for instructions on punitive damages.
There is a strong policy favoring liberal allowance of amendments to pleadings even if they are requested during trial. (Code Civ. Proc., § 473, subd. (a); Honig v. Financial Corp. of America (1992) 6 Cal.App.4th 960, 965, 7 Cal. Rptr.2d 922.) "On the other hand, the decision to allow an amendment to the pleadings in the midst of trial rests in the sound discretion of the trial court and should not be disturbed absent a clear showing of abuse...." (Consolidated World Investments, Inc. v. Lido Preferred Ltd. (1992) 9 Cal.App.4th 373, 383, 11 Cal. Rptr.2d 524.)
Civil Code section 3294 authorizes an award of punitive damages on "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice,...." (Id., subd. (a).) Malice in the context of punitive damages means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Id., subd. (c)(1).)
The court in Nolin v. National Convenience Stores, Inc., supra, 95 Cal.App.3d 279, 157 Cal.Rptr. 32 addressed the question whether evidence of a "willful and conscious disregard of the rights or safety of others" was sufficient to uphold an award of punitive damages in an action for negligence not alleging an intentional tort. The court started with the general rule that "conduct classified only as unintentional carelessness, while it may constitute negligence or even gross negligence, will not support an award of punitive damages." (95 Cal.App.3d at pp. 285-286, 157 Cal.Rptr. 32.) However, the Nolin court noted the California Supreme Court in Donnelly v. Southern Pacific Co. (1941) 18 Cal.2d 863, 118 P.2d 465 had long ago acknowledged negligent conduct amounting to wanton and reckless misconduct could in certain factual situations warrant punitive damages. According to the Donnelly court, "A tort having some of the characteristics of both negligence and willfulness occurs when a person with no intent to cause harm intentionally performs an act so unreasonable and dangerous that he knows, or should know, it is highly probable that harm will result. [Citations.] Such a tort ... is most accurately designated as wanton and reckless misconduct. It involves no intention, as does willful misconduct, to do harm, and it differs from negligence in that it does involve an intention to perform an act that the actor knows, or should know, will very probably cause harm. [Citations.] Wanton and reckless misconduct is more closely akin to willful misconduct than to negligence, and it has most of the legal consequences of willful misconduct. Thus, it justifies an award of punitive damages,..." (Donnelly v. Southern Pacific Co., supra, 18 Cal.2d 863, 869-870, 118 P.2d 465.)
*151 The Nolin court compared the Donnelly court's phrase of "wanton and reckless misconduct" with other courts' similar descriptions of conduct warranting punitive damages, including conduct demonstrating "a conscious disregard of the plaintiffs rights" (Silberg v. California Life Ins. Co. (1974) 11 Cal.3d 452, 462, 113 Cal.Rptr. 711, 521 P.2d 1103), a "conscious disregard of the safety of others" (G.D. Searle & Co. v. Superior Court (1975) 49 Cal.App.3d 22, 32, 122 Cal.Rptr. 218), and conduct evidencing an "evil motive" (Davis v. Hearst (1911) 160 Cal. 143, 163, 116 P. 530). The Nolin court concluded the various formulations all accurately defined the type of "malice" necessary for an award of punitive damages for an unintentional tort. As explained by the Nolin court "[t]hey all have the same meaning in announcing a rule of law that authorizes an award of punitive damages for a nonintentional tort where defendant's conduct which causes injury is of such severity or shocking character that it warrants the same treatment as that accorded to willful misconduct conduct in which the defendant intends to cause harm." (95 Cal.App.3d at p. 286, 157 Cal.Rptr. 32.)
By way of example the Nolin court referred to the decision in Seimon v. Southern Pacific Transportation Co., supra, 67 Cal.App.3d 600, 136 Cal.Rptr. 787. There, an injured motorist sued a railroad company for personal injuries he sustained when the delivery truck he was driving was struck by an oncoming train. The evidence established the railroad had known for decades the railroad crossing was particularly dangerous because trains were difficult to see as they approached the intersection at an angle and because there were no warning signals or crossing gates at the intersection. Over the years several accidents had occurred at the crossing. The appellate court found the record "replete with evidence pointing to the peculiarly dangerous character of the Nevin Avenue crossing to southbound motorists." (67 Cal.App.3d at p. 607, 136 Cal.Rptr. 787.) The court further found sufficient evidence of maliceor "a conscious and callous indifference to, or disregard of, probable harm to motorists"to justify the award of punitive damages against the railroad. (67 Cal.App.3d at p. 609, 136 Cal.Rptr. 787.)
Relying on these decisions, the Nolin court found the jury's award of punitive damages against the corporate owner of a service station where the plaintiff slipped and fell in a puddle of motor oil and gasoline was supported by substantial evidence of a callous disregard for the safety of others. The evidence established that for months customers and employees alike had complained about a broken gasoline pump which tended to overflow onto the ground and onto customers. When management refused to fix the pump, employees tried to alert the public by posting signs or by making public service announcements. Management feared loss of business and reputation and forced the employees to stop these practices. In addition, the service station sold cans of oil and permitted customers to add oil to their ears in the pumping areas. As a consequence the surface was often covered with pools of oil and littered with empty oil cans. Employee training was nonexistent. In addition, clean-up around the service station was sporadic and haphazard.
The Nolin court found "[t]he result was that the pump area constituted a continuing peril to all who ventured there. This danger was compounded by the fact that, at night, the lighting was very poor. Witnesses testified that, prior to plaintiffs accident, two members of the public had fallen there as well as several of defendant's own employees." (95 Cal.App.3d at p. 284, 157 Cal.Rptr. 32.) When the supervisor was informed of these accidents he allegedly responded, "`the store didn't have anything to worry about because they had a team of lawyers that would tie it up in court for years.'" (95 Cal.App.3d at p. 283, 157 Cal.Rptr. 32.)
*152 The court concluded this was ample evidence of management's complete lack of concern regarding the harmful potential of its premises and the probability and likelihood of injury to warrant punitive damages in the plaintiffs negligence action. (95 Cal.App.3d at p. 288, 157 Cal.Rptr. 32.)
Based on these decisions Allen contends the trial court erred in denying his request to amend his pleadings to assert a claim for punitive damages based on a conscious disregard theory. He points to Sully-Miller's superintendent's testimony the uneven concrete bus pad existed for at least three weeks prior to his accident. In addition, Allen notes Sully-Miller's superintendent acknowledged the uneven surface of the bus pad posed a risk of injury to motorists, cyclists and pedestrians alike. The superintendent testified it was for this reason the custom and practice in the industry was to place delineators or barriers around the uneven surface to protect users of the road. Allen also points to his testimony that warning barricades or traffic cones had been missing from the uneven bus pad for some timeperhaps for three days, or perhaps for as long as two weeks.
In contrast to the Nolin, Seimon and Donnelly decisions permitting punitive damages on a conscious disregard theory, here the evidence of Sully-Miller's negligence was tempered by evidence of their efforts to prevent harm to the travelling public. Sully-Miller had a traffic control plan which reflected concern about third-party safety. Evidence established that when notified of problems with missing or destroyed delineators Sully-Miller corrected the deficiencies the next day. The evidence also established the Los Angeles city inspector, who was physically present at the site five days a week, had not issued a notice of noncompliance for some six months prior to the incident. This evidence suggested Sully-Miller had been taking steps to prevent further deficiencies.
Also, and unlike the other decisions allowing punitive damages, here there was no evidence of prior accidents caused by the height differential, let alone that Sully-Miller knew about prior accidents and deliberately chose to take no corrective measures. Although the evidence established road barriers or delineators had been missing from three days to two weeks, there was also evidence Sully-Miller had provided safety devices along the length of the bus pad and had attempted to maintain these safety measures throughout the construction period.
In short, even assuming the defective bus pad remained unprotected and thus posed a risk of injury to motorists and pedestrians for an entire two-week period, this is not the type of extreme, despicable conduct, or conduct of such a shocking character, which could permit a jury to find the requisite malice for punitive damages. (Cf. Nolin v. National Convenience Stores, Inc., supra, 95 Cal.App.3d at p. 286, 157 Cal.Rptr. 32.) In other words, while these factual circumstances may be evidence of negligence, they do not rise to the level of a callous indifference to, and a conscious disregard of, the safety of others to support an award of punitive damages. Accordingly, we conclude the trial court did not abuse its discretion in refusing jury instructions on punitive damages.

DISPOSITION
The judgment as it applies to respondent Sully-Miller is reversed and the cause remanded for new trial on all issues including liability and damages. The judgment as it applies to defendants Daniel Lopez Concrete Construction and the City of Los Angeles is unaffected. Appellant to recover his costs of appeal.
LILLIE, P.J., concurs.
NEAL, J., concurring.
Appellant sued for injuries suffered while driving his motorcycle. He fell after striking a three inch high concrete "bus pad" built by respondent contractor. He claimed the pad created an unreasonable hazard. Appellant had no insurance.
Civil Code section 3333.4 bars recovery of non-economic damages by an uninsured driver in an action "arising out of the *153 operation or use of a motor vehicle." Looking only at the statutory language, I would readily conclude that appellant's non-economic damages "arose from the operation or use of his motorcycle, and therefore could not be recovered. However, Hodges v. Superior Court (1999) 21 Cal.4th 109, 86 Cal.Rptr.2d 884, 980 P.2d 433 held that section 3333.4 did not apply to a claim against a car maker for an allegedly defectively designed gas tank which ruptured and injured plaintiff when a truck struck his car while driving on the freeway. After examining ballot pamphlets prepared before enactment of section 3333.4 by initiative, the court concluded that section 3333.4 was intended to protect insured drivers against suits by uninsured driversnot to protect car manufacturers.
While I think Hodges at odds with the language of section 3333.4, and while I share Justice Werdegar's reservations about the "broadly non-textual approach to statutory interpretation" taken by the majority opinion in Hodges (concurring opinion, 21 Cal.4th at 119, 86 Cal.Rptr.2d 884, 980 P.2d 433), I see no principled way to distinguish the present case from Hodges.
So I concur in the judgment.
NOTES
[1] Allen does not challenge either of these aspects of the trial. The City of Los Angeles's project inspector presented evidence to establish Santa Monica Boulevard is a state highway, under state jurisdiction, and thus Caltrans was solely responsible for its safety and maintenance.
[2] Civil Code section 3333.4 also bars recovery of noneconomic losses to compensate for pain, suffering and other nonpecuniary damages if the injured person was driving under the influence of alcohol or drugs and was convicted of the offense. (Id., subd. (a)(1).) This section provides an exception to the bar against recovery of noneconomic losses when the owner of an uninsured vehicle is injured by a motorist driving under the influence of drugs or alcohol. (Id., subd. (c).)
[3] In light of our conclusion the trial court erred in finding Civil Code section 3333.4 applied in this factual situation, we need not reach Allen's other contentions that Sully-Miller waived the preclusion issue by failing to raise it as an affirmative defense in its answer, or in the alternative, waived the defense by waiting until the first day of trial to move to exclude evidence of noneconomic damages in violation of the court's orders to resolve all preliminary issues by motions in limine.