[Civ. No. 48241. Second Dist., Div. Five. Feb. 28, 1977.]

JAMES SEIMON, Plaintiff and Appellant, v.
SOUTHERN PACIFIC TRANSPORTATION
COMPANY, Defendant and Appellant.

## COUNSEL

Louis S. Edelberg and Stuart W. Fest for Plaintiff and Appellant.

Merrill K. Albert, Morris & Polich, Landon Morris and John K. Morris for Defendant and Appellant.

## OPINION

**STEPHENS, Acting P. J.**—Plaintiff James Seimon appeals from an order granting a partial new trial on the issue of damages following a judgment entered on a jury verdict in his favor and against defendant Southern Pacific Transportation Company (Southern Pacific). In addition, plaintiff seeks a new trial limited solely to the issue of whether or not he is entitled to an award of punitive damages. We affirm the order granting a new trial but remand for further determination on the issue of punitive damages.

### FACTS

In the early evening hours of January 11, 1972, plaintiff was driving his 60-foot truck-trailer to the A & B Garment Delivery Company trucking yard located on Nevin Avenue in Los Angeles. At approximately 9:15 p.m., he reached the Adams-Nevin intersection, turned right onto Nevin

and drove south toward defendant's railroad crossing. The crossing was partially obscured to the west by several buildings and was protected by no warning signs in this portion of the block; however, plaintiff was familiar with the crossing, having taken this route many times before.

Hearing no bell or whistle, plaintiff proceeded slowly onto the tracks. Just then, he looked to his right and saw the headlight of an oncoming train. Plaintiff attempted to accelerate across the tracks, while at the same time defendant's engineer applied the engine's emergency braking system. The train struck the right rear quarter of plaintiff's trailer, propelling it some 25 feet sidewise before coming to a full stop. As a result of the impact plaintiff's trailer was severely damaged, and plaintiff suffered personal injury.

Plaintiff filed this action against defendant alleging negligence (count I) and wilful misconduct (count II). At the conclusion of plaintiff's case, the court granted defendant's motion for nonsuit as to the second count. A jury returned a special verdict finding negligence on the part of both parties, and allowing a 50 percent recovery to plaintiff, in the amount of $33,320. Defendant then moved for a new trial alleging misconduct by opposing counsel and excessive damages. The motion for new trial was granted as to the issue of damages after plaintiff refused to agree to a remittitur.

## DISCUSSION

### The Order Granting a New Trial

New trial was ordered on the grounds of irregularity in the proceedings of the adverse party, excessive damages, and insufficiency of the evidence to support the verdict. Plaintiff contests the propriety of the ruling on the first ground, arguing that none of the acts cited by the court are tantamount to misconduct by counsel, and that even conceding that there was misconduct, that it was waived by failure to object or by failure to request an admonitory instruction to the jury. We cannot agree.

Taking up the latter argument, we note that the primary oversight is that this is an appeal from the *granting* of a new trial, as opposed to an appeal from the denial of a new trial or from a judgment. In the case at bench, the sole question is whether there has been an abuse of discretion. ■ Where the appeal is from an order granting a new trial and counsel for appellant has been guilty of misconduct, the fact that

counsel for respondent has failed to take timely exception is not to be considered in determining whether the trial court has abused its ·discretion in granting the motion. (*Weaver* v. *Shell Oil Co. of California* (1933) 129 Cal.App. 232, 235 [18 P.2d 736]. See also *Malkasian* v. *Irwin* (1964) 61 Cal.2d 738, 747-748 [40 Cal.Rptr. 78, ·394 P.2d 822]; *Merralls* v. *Southern Pacific Co.* (1920) 182 Cal. 19, 25 [186 P. 778]; *Hoel* v. *City of Los Angeles* (1955) 136 Cal.App.2d 295, 307 [288 P.2d 989].) "To hold otherwise would mean that the trial court, by reason of the action of the parties, would be powerless to correct what might be an obvious miscarriage of justice." (*Nieves* v. *Vigolino* (1933) 135 Cal.App. 763, 765 [27 P.2d 916].) Thus even though defendant technically may have waived his right to claim error with respect to opposing counsel's misconduct, that fact could not impair the power of the court to do justice by granting a new trial. (See *Hoel* v. *City of Los Angeles, supra.*)

Our review of the sufficiency of the acts cited by the court as misconduct by plaintiff's attorney is necessarily limited. ■ "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside." (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]. See also *Malkasian* v. *Irwin, supra,* 61 Cal.2d 738, 748.) Thus the question is not whether the challenged acts by opposing counsel were prejudicially erroneous, but whether they were sufficiently oppro-brious so that the trial court *could* conclude that they were improper. (See *Malkasian* v. *Irwin, supra.*)

■ Among the acts of misconduct noted by the trial court were improper comments by plaintiff's counsel during argument that he represented poor people. At the ·opening of final argument counsel digressed as follows: "Now, I am not a railroad lawyer. I am not a corporation lawyer. I guess that you figured that out in your own minds, didn't you? *I represent the little guy,* and if I am not as good a lawyer as Mr. Albert, well, this is as much as the little guys can afford, I guess. Don't think that I am saying to you that I think I am a bad lawyer, because I don't think so. I think that I am pretty good, but that has nothing to do with the case, anyway." (Italics added.) In the same vein, several minutes later, counsel again stated: "They didn't hire me because

I am a bad lawyer. I represent little guys, but I am no bad lawyer. I am not a bad lawyer. . . . I am an honest lawyer." Finally, counsel declared that he "spent money in this case like it was going out of style." The latter comment drew an objection from defense counsel, which was sustained summarily.

It seems clear to us that plaintiff's counsel was deliberately trying to convey an image of himself and his client as financial underdogs, as "little guys," in a court battle against the "big guy" railroad corporation. This clearly was improper. "Justice is to be accorded to rich and poor alike, and a deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case." (*Hoffman* v. *Brandt* (1966) 65 Cal.2d 549, 552-553 [55 Cal.Rptr. 417, 421 P.2d 425]. See also *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 14 [116 Cal.Rptr. 575].) Obviously, questions of liability and the amount of damages in the ordinary personal injury case are to be determined without regard to the existing financial status of the plaintiff or plaintiff's counsel, or the ability of the defendant to pay any judgment which might be rendered against him. (See *Hoffman* v. *Brandt, supra,* at p. 554.) Such improper comments could have caused the jury to render an inflated verdict. While the error may not seem too serious from our vantage point, we give weight to the expressed opinion of the trial judge that such error in fact resulted in a verdict of passion and prejudice. ■ As long as there is any possible ground to sustain the order for new trial, we should sustain it, even if that ground is only a debatable one. (*Malkasian* v. *Irwin, supra,* at p. 749.)

*The Nonsuit*

■ Plaintiff charges that it was error for the trial court to grant a nonsuit as to his second cause of action for wilful misconduct so as to remove the issue of punitive damages from the jury's consideration. He claims that pursuant to section 3294 of the Civil Code, there was sufficient evidence from which the jury might infer that Southern Pacific acted with malice. Mindful of the standards of review applicable to the granting of a nonsuit, our review of the testimony of plaintiff's witnesses, and of the exhibits presented at trial impels the conclusion that there was evidence of sufficient substantiality to support an award of punitive damages against defendant.

■ *Animus malus* or evil motive is the central element of the malice which justifies an award of punitive damages. (*G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 30 [122 Cal.Rptr. 218].) Most often this element is proven by circumstantial evidence alone. Nevertheless, that element "calls upon the jury to assess the defendant's *actual state of mind*; it is not satisfied by characterizing his conduct as unreasonable, negligent, grossly negligent or reckless." (*Id.,* at p. 31; italics added.) The *Searle* court, after exhaustively reviewing the various judicial formulations of malice in cases of nondeliberate tortious conduct settled upon *conscious disregard of safety* as an appropriate description of the *animus malus* requisite to an award of punitive damages. Using this yardstick, we turn now to plaintiff's most serious allegation concerning defendant's failure to provide adequate crossing protection.

■ The record is replete with evidence pointing to the peculiarly dangerous character of the Nevin Avenue crossing to southbound motorists. A number of elements comprised this danger. First, while the train traffic at the crossing was light, averaging about three movements per day in each direction, the automobile traffic was much heavier— about 2,000 vehicles per day. A significant portion of the traffic consisted of long tractor-trailer truck rigs, such as plaintiff's. Second, the crossing to the south was a blind one having two buildings on either side of the street,[1] and there were no visual warnings of oncoming trains, either in

---

[1] One of plaintiff's experts testified on this point as follows: "When a driver approaches a railroad crossing, he has to do quite a few things. Number one, he has to know there's a crossing there. Number two, if he sees a train approaching he has to make a decision as to whether he has to stop or whether he has enough time to proceed across safely on the crossing. [¶] There's a critical point in driving in the approach to a railroad crossing, where there has to be time, enough for him to first of all perceive the train, then he has to react if he decides to stop, getting his foot on the brake, applying the brakes, and then there's another portion of time necessary to actually stop the car. [¶] In this particular case, it is a 25 mile zone back up the street. I believe the Vehicle Code in California says that when you approach a blind railroad crossing like this that the speed limit drops to 15 automatically, similar to a blind intersection. [¶] Many drivers don't know this fact, but because of the lack of sight distance south bound the drivers are actually suppose to reduce to 15; even at 15 miles an hour in a passenger car on dry pavement. . . . [¶] For design purposes you use a truck on wet pavement and a two and a half second reaction time because a lot of circumstances you really have to tell what's there and make a decision, but some, although, can react quicker. [¶] When you see something for design purposes, they usually allow the driver more time before he gets into trouble. In the case of a truck, and this longer reaction time, it would be back 95 feet from the cross walk or—excuse me—from the rail, which would put it up just about opposite the overhead street light that's there. . . . [¶] Back at this 95 foot—I'll put that down—the driver can only see 92 feet along the rail from where he will cross it physically. . . . [¶] Now, in order for a truck driver to be adequately able to judge whether he has to slow down or speed up to get across, he needs a hundred and three feet of distance along the track. . . . [¶] He needs to be able to see a train at this location in order to react and properly stop as he

the form of crossing gates or flashing red lights. This danger was exacerbated by the 59-degree angle at which the tracks intersected the street, and by the somewhat confusing street pattern at the crossing. The existing crossing angle in contrast to a right angle crossing, made it more difficult for the motorist to check for train traffic, and to judge the speed of approaching trains. The street pattern at the crossing tended to divert the motorist's attention from the tracks. Thus, the majority of traffic crossing to the south on Nevin was traffic proceeding east on Adams Boulevard which was forced to "dogleg" to the south on Nevin, prior to picking up Adams again on the opposite side of the tracks. Finally, the buildings preceding the southbound crossing on Nevin had the effect of reducing both audible and visual signals from oncoming trains. Prior to plaintiff's accident two other southbound motorists had been hit at the Nevin Avenue crossing—one in 1965 and one in 1969. In sum, as one expert put it, "the only person that [could] really see this intersection or see what [was] coming at them [*sic*] [was] the train conductor or engineer. The driver [was] totally at the mercy of the railroad . . . ."

Plaintiff also established that Southern Pacific for some time was aware of the highly dangerous nature of this crossing, and in spite of this knowledge failed to take any corrective action. Robert Thruston, the Los Angeles Division superintendent for defendant, who had overall responsibility for maintaining adequate crossing protection at the several thousand grade crossings within his jurisdiction, testified that he had ridden this particular stretch of tracks to check for crossing safety. The blind character of the Nevin Avenue crossing would have been immediately apparent to him or to anyone making such a check. In spite of Thruston's knowledge of the efficacy of crossing gates or flashing lights in reducing crossing accidents, and in spite of his assertion that he had attempted to get as many crossings as possible protected with crossing gates, he made no attempt to take such action with respect to the Nevin Avenue crossing. Also, Frank Lathrop, the Public Project Engineer for Southern Pacific, had examined the Nevin Avenue crossing several times between 1948 and 1974, and knew that it was without crossing gates or flashing lights. Despite the concern each man had for public safety, reports of the two prior accidents at the crossing never reached the desks

approaches this, and I'll repeat that's only for a 15 mile design speed. [*] If it got up to 25, it would be significantly further back; and, of course, the building is in his way and that's why this is one of the factors that make this crossing hazardous is the fact that the sight distance is so poor for the southbound direction which also was the direction of all three of the vehicles and all three of the accidents which have occurred."

of either man prior to this litigation. Thruston was apparently only notified of accidents involving injury or severe property damage. Nevertheless, at least one of the prior accidents, as well as plaintiff's, involved some personal injury.

The foregoing adds up to more than just benign neglect on the part of defendant. Indeed, the jury could have gleaned from this evidence that defendant had displayed a conscious and callous indifference to, or disregard of, probable harm to motorists making the southbound crossing at Nevin Avenue. (Cf. *Colson* v. *Standard Oil Co.* (1976) 60 Cal.App.3d 913, 921-922 [131 Cal.Rptr. 895].)

■ " 'It is the intention of the law that the jury, . . . as finder of fact, is entitled to pass upon the whole record, except in those relatively rare cases where, as a matter of law, the plaintiff has not made out a case and would not be entitled to judgment in his favor.' " (*Paul* v. *Wadler's Cash & Carry, Inc.* (1964) 230 Cal.App.2d 351, 353 [41 Cal.Rptr. 18].) We cannot say, as a matter of law, that there was such a paucity of evidence on the issue of malice as to preclude the jury from considering the propriety of an award of punitive damages against defendant, Southern Pacific.

As we have concluded that a retrial should be had on the issue of punitive damages, we need not now decide whether, as plaintiff asserts, section 2106 of the Public Utilities Code[2] provides a basis for punitive damages, independent of section 3294 of the Civil Code. Even if we were to so decide, the record does not contain evidence that defendant wilfully violated a statute or order of the Public Utilities Commission.[3]

---

[2]Section 2106 provides as follows: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. *If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages.*" (Italics added.)

[3]Failure to provide a crossing sign (crossbuck) just in advance of the crossing in accordance with General Order 75-B of the Public Utilities Commission was not a cause of the accident since plaintiff was aware of the *existence* of the crossing. Failure to sound the train's whistle as required by section 7604 of the Public Utilities Code cannot be ascribed to Southern Pacific itself in this instance. Even if there had been isolated incidents of such omissions on the part of engineers approaching this crossing, and even if Southern Pacific might be charged with knowledge of this fact by virtue of having offices in the vicinity, defendant cannot be said to have *authorized* such a practice.

The order granting a new trial is affirmed. The judgment of nonsuit is reversed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied March 22, 1977, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied May 12, 1977.