Fourth Dist., Div. One. May 26, 1983.]

PHILLIP CAREL SCHREEFEL, Plaintiff and Appellant, v.
JOSEPH WILLIAM OKULY et al., Defendants and Appellants;
NATIONAL STEEL AND SHIPBUILDING COMPANY,
Intervener and Respondent.

COUNSEL

Maynard O. Kartvedt, McInnis, Fitzgerald, Rees, Sharkey & McIntyre and William R. Warhurst for Plaintiff and Appellant and for Defendants and Appellants.

Schall, Boudreau & Gore and Robert D. Woods for Intervener and Respondents.

OPINION

**COLOGNE, J.**—Phillip Carel Schreefel appeals the judgment rendered in his favor, contending the jury was not allowed to consider punitive damages for alleged wilful misconduct, and Joseph William Okuly and the Atchison, Topeka and Santa Fe Railway Company (jointly, Railroad) cross-appeal, contending admiralty law should not have been applied to allow the claim of Schreefel's employer, National Steel and Shipbuilding Company (NASSCO), for contribution toward benefits paid to the employee.

Schreefel, a maritime employee of NASSCO, was injured when his car was struck by a train operated by the Santa Fe engine foreman, Okuly, and his fireman, Terrence Durkin. The accident occurred during NASSCO's normal shift change, on a railroad crossing which traversed a driveway customarily used by NASSCO employees to leave the employer's parking lot at Harbor Drive. At the time of the accident the traffic flow at the railroad crossing was congested with bumper-to-bumper traffic. The crossing was uncontrolled and allowed vehicles to become trapped when forward vehicles were stopped by the traffic signal at the exit onto Harbor Drive and following vehicles had moved up to prevent a retreat. Schreefel's car was in the center of three lanes of traffic stopped on the tracks at the intersection. When the forward traffic moved, his car stalled and remained on the track in the path of the oncoming train. When the operators of the oncoming train had observed the congestion at the intersection and the obstruction, they braked slowing the train to approximately 10 miles per hour.[1] Approximately 500 feet from the crossing, when traffic started moving again, the operators of the engine released the brakes and began accelerating. Both men in the engine recognized the Schreefel vehicle was not moving and that a collision was imminent. At that point, they were traveling about 13 or 14 miles per hour. "Emergency" braking was immediately applied. At this moment, the engine was about 75 feet from the point of impact. The engine could not stop in time to avoid the collision. Schreefel's passenger escaped without injury, but Schreefel remained in the car which was struck by the train and pushed some 90 feet down the track.

NASSCO paid Schreefel benefits under the federal Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. § 901 et seq.; LHWCA) and Schreefel sued the Railroad in state court. NASSCO intervened in the state court proceedings to recover its paid compensation benefits from the Railroad. The Railroad promptly raised NASSCO's own contributory negligence as a defense. The jury returned special verdicts, finding Schreefel's total damages were $45,000. His comparative negligence was 55 percent, NASSCO's comparative negligence was 15 percent. The trial court calculated Schreefel's share of the recovery by first deducting Schreefel's 55 percent comparative negligence, then allowing NASSCO to recover its entire compensation lien without reduction for its own negligence, according to federal admiralty standards.[2] By contrast, the Railroad wants an apportionment as follows:

[1] Speeds were determined by a tachometer tape and distances were approximated by the testimony of the operators and the sand on the tracks which is automatically released when the brakes are applied.

[2] We deem unmeritorious Schreefel's argument NASSCO's reimbursement of the $15,341 compensation it paid should be deducted from the $45,000 before reduction of the remainder for his 55 percent comparative negligence (see *Pope & Talbot, Inc.* v. *Hawn* (1953) 346 U.S. 406, 408-409 [98 L.Ed. 143, 150-151 [74 S.Ct. 202, 204]; *Edmonds* v. *Compagne Generale Transatl.* (1979) 443 U.S. 256, 258, fn. 2 [61 L.Ed.2d 521, 526, 99 S.Ct. 2753, 2755]; *Haynes* v. *Rederi A/S Aladdin* (5th Cir. 1966) 362 F.2d 345, 350; and see *Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 512, fn. 4 [156 Cal.Rptr. 41, 595 P.2d 619]).

*Schreefel's Recovery*

| | | |
|---|---|---|
| Total damages | $45,000 | |
| Less: Schreefel's 55 percent negligence | −24,750 | |
| Subtotal | | $20,250 |
| | | |
| Less: Proportionate amount attributable to NASSCO's negligence up to the amount of benefits paid (30 percent of 45,000 is 13,500, which is less than benefits paid) | | −13,500 |
| Judgment for Schreefel | | $ 6,750 |

*NASSCO's Recovery*

| | | |
|---|---|---|
| Amount of benefits paid | $ 15,341 | |
| Less: NASSCO's 30 percent negligence | −13,500 | |
| | | |
| Judgment for NASSCO | | $ 1,841 |

■ Under federal law, the employer is entitled to recover from the third party successfully sued by the employee the full measure of the compensation paid the employee under LHWCA, without reduction for attorney's fees (*Bloomer* v. *Liberty Mutual Ins. Co.* (1980) 445 U.S. 74, 79-88 [63 L.Ed.2d 215, 221-227, 100 S.Ct. 925, 928-933]), without contribution (*Halcyon Lines* v. *Haenn Ship Corp.* (1952) 342 U.S. 282 [96 L.Ed. 318, 72 S.Ct. 277]), without indemnity (unless there is a contractual indemnity agreement, express or implied) (*Davis* v. *Chas. Kurz & Co., Inc.* (9th Cir. 1973) 483 F.2d 184, 188; and see *IT Corp.* v. *Superior Court* (1978) 83 Cal.App.3d 443, 451 [147 Cal.Rptr. 828]) and without adjustment due to the comparative fault of the employer vis-à-vis the third party (*Edmonds* v. *Compagnie Generale Transatl., supra,* 443 U.S. 256, 271-273). These cases were decided under maritime law as well as LHWCA. In *Edmonds, supra,* the high court observed it was dealing with an interface of statutory and judge-made law (443 U.S. at p. 272 [61 L.Ed.2d at p. 534, 99 S.Ct. at p. 2762]) and did not want to disturb this delicate balance struck on the basis of Congress' understanding of the law (443 U.S. at p. 273 [61 L.Ed.2d at p. 535, 99 S.Ct. at p. 2763]). Part of this understanding of the law is stated by the court as follows (443 U.S. at pp. 268-271 [61 L.Ed.2d at pp. 532-534, 99 S.Ct. at pp. 2760-2762]): "[T]he proportionate-fault rule . . . itself produces consequences that we

doubt Congress intended. It may remove some inequities, but it creates others and appears to shift some burdens to the longshoreman.

"As we have said, § 905 permits the injured longshoreman to sue the vessel and exempts the employer from any liability to the vessel for any damages that may be recovered. Congress clearly contemplated that the employee be free to sue the third-party vessel, to prove negligence and causation on the vessel's part, and to have the total damages set by the court or jury without regard to the benefits he has received or to which he may be entitled under the Act [LHWCA]. Furthermore, under the traditional rule, the employee may recover from the ship the entire amount of the damages so determined. If he recovers less than the statutory benefits, his employer is still liable for the statutory amount.

"Under this arrangement, it is true that the ship will be liable for all of the damages found by the judge or jury; yet its negligence may have been only a minor cause of the injury. *The stevedore-employer may have been predominantly responsible; yet its liability is limited by the Act,* and if it has lien rights on the longshoreman's recovery it may be out-of-pocket even less.

"*Under the* Court of Appeals' *proportionate-fault rule,* however, *there will be many circumstances where the longshoreman will not be able to recover in any way the full amount of the damages determined in his suit* against the vessel. *If, for example, his damages are at least twice the benefits paid or payable under the Act and the ship is less than 50% at fault, the total of his statutory benefits plus the reduced recovery from the ship will not equal his total damages.* More generally, it would appear that if the stevedore's proportionate fault is more than the proportion of compensation to actual damages, the longshoreman will always fall short of recovering the amount that the factfinder has determined is necessary to remedy his total injury, even though the diminution is due not to his fault, but to that of his employer.

"But the impact of the proportionate-fault rule on the longshoreman does not stop there. Under § 933(b), an administrative order for benefits operates as an assignment to the stevedore-employer of the longshoreman's rights against the third party unless the longshoreman sues within six months. And a corresponding judicially created lien in the employer's favor operates where the longshoreman himself sues. In the past, this lien has been for the benefits paid up to the amount of the recovery. And under § 933(c), which Congress left intact in 1972, *where the stevedore-employer sues the vessel as statutory assignee* it may retain from any recovery an amount equal in general to the expenses of the suit, the costs of medical services and supplies it provided the employee, all compensation benefits paid, the present value of benefits to be paid, plus one-fifth of whatever might remain. Under the Court of Appeals' proportionate-

fault system, the longshoreman would get very little, if any, of the diminished recovery obtained by his employer. Indeed, *unless the vessel's proportionate fault exceeded the ratio of compensation benefits to total damages, the longshoreman would receive nothing from the third-party action, and the negligent stevedore might recoup all the compensation benefits it had paid.*

"Some inequity appears inevitable in the present statutory scheme, but we find nothing to indicate and should not presume that Congress intended to place the burden of the inequity on the longshoreman whom the Act seeks to protect. Further, the 1972 Amendments make quite clear that 'the employer shall not be liable to the vessel for such damages *directly or indirectly,*' 33 U.S.C. § 905(b) (emphasis supplied), and that with the disappearance of the ship's contribution and indemnity right against *the stevedore* the latter *should no longer have to appear routinely in suits between longshoreman and shipowner.* Consequently, as we have done before, we must reject a 'theory that nowhere appears in the Act, that was never mentioned by Congress during the legislative process, that does not comport with Congress' intent, and that restricts . . . a remedial Act. . . .' [Citation.]" (Italics added; fns. omitted.)

*Edmonds,* though dealing with a maritime case, said "Congress might have intended to adopt the existing maritime rule even for third-party actions under the Act [LHWCA] that are not within the admiralty jurisdiction, though we need not and do not reach that issue today." (443 U.S. at p. 273 [61 L.Ed.2d at p. 535, 99 S.Ct. at p. 2763].) In a footnote, the court said its decision "does not necessarily have any effect on situations where the Act provides the workers' compensation scheme but the third-party action is not governed by principles of maritime law." (443 U.S. at p. 272, fn. 31 [61 L.Ed.2d at p. 535, 99 S.Ct. at p. 2762].)

Thus, there is no binding authority from our highest court on the question as it affects nonmaritime cases under LHWCA. Cases in other jurisdictions considering the application of a principle similar in theory to comparative negligence, the so-called "Murray credit" which would hold the third party and employer each liable as joint tortfeasors for 50 percent of the damages, giving a credit in that amount to the third party tortfeasor (see *Murray* v. *United States* (D.C. Cir. 1968) 405 F.2d 1361, 1365-1366), have not been in accord. For example, *Dawson* v. *Contractors Transport Corp.* (D.C. Cir. 1972) 467 F.2d 727, cited in *Edmonds, supra,* 443 U.S. at page 272, footnote 31 [61 L.Ed.2d at page 535, 99 S.Ct. at page 2762], would follow *Murray* and allow the trial court to establish the credit. On the other hand, *Ceco Corp.* v. *Coleman* (D.C.App. 1982) 441 A.2d 940, does not permit application of the Murray credit in an essentially identical private, nonmaritime setting under LHWCA. *Ceco* found the "*Edmonds* reasoning compelling" (*id.* at p. 955) in disallowing the *Murray* credit on account of the employer's concurrent negligence.

Likewise, the Ninth Circuit Court of Appeals, in a maritime law setting under LHWCA, has strongly held against application of a comparative fault concept as between employer and the third party (*Dodge* v. *Mitsui Shintaku Ginko K. K. Tokyo* (9th Cir. 1975) 528 F.2d 669). The cases not permitting application of comparative fault, the *Murray* credit, or any form of indemnity or contribution on account of the employer's negligence steadfastly protect the employer's right to recoup compensation payments out of the recovery against the third party. For example, in a maritime case where the third party tortfeasor contended the judgment against it should be reduced by the amount of workers' compensation payments made by the employer under the LHWCA, the United States Supreme Court said: ". . . Pope & Talbot [third party tortfeasor] says that if Hawn [employee] keeps the money he will have a double recovery and that to allow him to repay Haenn [employer] would give an unconscionable reward to an employer whose negligence contributed to the injury. A weakness in this ingenious argument is that § 33 of the Act [LHWCA] has specific provisions to permit an employer to recoup his compensation payments out of any recovery from a third person negligently causing such injuries. *Pope & Talbot's contention if accepted would frustrate this purpose to protect employers who are subjected to absolute liability by the Act.* Moreover, reduction of Pope & Talbot's liability at the expense of Haenn would be the substantial equivalent of contribution which we declined to require in the Halcyon case." (*Pope & Talbot, Inc.* v. *Hawn, supra,* 346 U.S. 406, 412; italics added.) Likewise, it seems clear application of California's comparative fault principle to reduce the employer's recoupment of the compensation paid, as in *Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829, 842 [150 Cal.Rptr. 888, 587 P.2d 684], and *Aceves* v. *Regal Pale Brewing Co., supra,* 24 Cal.3d 502, 512 (see also *Witt* v. *Jackson* (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641]), would frustrate this purpose of the LHWCA and would be similar to contribution contrary to the federal scheme. Since the compensation payments here are directly under the federal LHWCA which grants the employer a right to full recoupment, it seems clear application of California's comparative fault principle so as to reduce the recoupment would abridge "substantive rights granted litigants under federal law" (*Carlson* v. *Pacific Far East Lines* (1973) 29 Cal.App.3d 883, 888 [105 Cal.Rptr. 885]). Thus, unlike the situation in *Carlson* where compensation was paid under state law and the rights claimed by the employer were granted by state law, principles of supremacy do not permit use of the comparative fault concept in this case (*Carlson, supra,* 29 Cal.App.3d at pp. 887-888).

Accordingly, persuaded by the supremacy aspect as well as the considerations referred to in *Edmonds,* quoted above, we conclude the trial court's refusal to apply comparative fault principles to reduce NASSCO's recoupment of the compensation paid is correct.

PUNITIVE DAMAGES

■ Schreefel alleged, and attempted to prove at trial, the Railroad acted in conscious disregard of his safety when it did not control the train sufficiently to be able to stop it in order to avoid vehicles stopped in plain view on the railroad crossing, and when it did not provide adequate warning lights or control of vehicular traffic at this crossing. An instruction regarding punitive damages was refused.

Exemplary damages are properly justified when the defendant is guilty of oppression, fraud or malice, express or implied (Civ. Code, § 3294). " 'It should be apparent that the malice, and the only malice, contemplated by section 3294 is malice in fact, and that the phrase "express or implied" has reference only to the evidence by which that malice is established; express malice thus meaning that the malice is established by express or direct evidence going to prove the actual existence of the hatred and ill-will; implied malice referring to the indirect evidence from which the jury may infer the existence of this malice in fact. . . . [I]t is only upon some showing regarded by the law as adequate to establish the presence of malice in fact, that is the motive and willingness to vex, harass, annoy, or injure, that punitive damages have ever been awarded. . . . [¶] And while in the cases this malice, the existence of which we have declared to be essential to a recovery in punitive damages, is sometimes called express malice, sometimes actual malice, sometimes real malice, and sometimes true malice, it is always in its analysis malice of the one kind, the malice of evil motive. . . . [¶] [T]he *animus malus* must be shown to exist in every case before an award in punitive damages may be made against a defendant, since the evil motive is the controlling and essential factor which justifies such an award. . . .' " (*G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal. App.3d 22, 29-30 [122 Cal.Rptr. 218], citing *Davis* v. *Hearst* (1911) 160 Cal. 143, 162-164 [116 P. 530].)

In *Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863 [118 P.2d 465], a similar claim for punitive damages was sought. There, the railroad switched the signal the wrong way, causing the accident. The court thus stated: "Negligence is an unintentional tort, a failure to exercise the degree of care in a given situation that a reasonable man under similar circumstances would exercise to protect others from harm. [Citation.] A negligent person has no desire to cause the harm that results from his carelessness, [citation], and he must be distinguished from a person guilty of willful misconduct, such as assault and battery, who intends to cause harm. [Citation.] Willfulness and negligence are contradictory terms. [Citations.] If conduct is negligent, it is not willful; if it is willful, it is not negligent. It is frequently difficult, however, to characterize conduct as willful or negligent. A tort having some of the characteristics of both negligence and willfulness occurs when a person with no intent to cause harm in-

tentionally performs an act so unreasonable and dangerous that he knows or should know, it is highly probable that harm will result. [Citations.] Such a tort has been labeled 'willful negligence,' 'wanton and willful negligence,' 'wanton and willful misconduct,' and even 'gross negligence.' It is most accurately designated as wanton and reckless misconduct. It involves no intention, as does willful misconduct, to do harm, and it differs from negligence in that it does involve an intention to perform an act that the actor knows, or should know, will very probably cause harm. [Citations.] Wanton and reckless misconduct is more closely akin to willful misconduct than to negligence, and it has most of the legal consequences of willful misconduct. Thus, it justifies an award of punitive damages, and contributory negligence by the plaintiff is not a defense. [Citation.]

"This is the type of misconduct that the federal courts characterize as 'willful and wanton negligence.' In *New York Central R. R. Co.* v. *Mohney, supra,* [252 U.S. 152 (64 L.Ed. 502, 40 S.Ct. 287)] an engineer ran his train past two separate danger signals and it crashed into a train ahead. The collision resulted in injury to plaintiff, who was traveling on a free pass containing a provision releasing the railroad from liability for negligence. The State Court of Appeals found the engineer guilty of willful and wanton negligence, and the United States Supreme Court held the railroad liable, despite the release in the pass, on the ground that there was sufficient evidence to support the state court's finding of willful and wanton negligence. A railroad engineer who has deliberately run his train past two danger signals has intentionally performed so dangerous an act that he must have known that harm would probably result, and he is guilty of wanton and reckless misconduct rather than negligence.

". . . . . . . . . . . . . . . . . . . . . . .

"In the present case the alleged conduct of the switchman does not constitute wanton and reckless misconduct. There is no allegation that he intended to throw the switch the wrong way. Apparently, he did not know he was throwing the switch the wrong way and that harm would probably result. He was guilty of negligence alone. This negligence may have been 'gross' under the California rule, but the federal cases are clear that such dereliction constitutes negligence and not wanton and reckless misconduct. 'It would be going a great way to say that the failure of the switch tender to throw the switch so that the train would go on the main line was a wanton and malicious neglect. The only thing that can be said is that some one was careless, and that is admitted.' [Citations.] There is therefore no basis for a finding of reckless and wanton misconduct." (*Donnelly, supra,* 18 Cal.2d at pp. 869-870, 872.)

The closest factual situation we have been able to find in support of plaintiff's argument is *Seimon* v. *Southern Pac. Transportation Co.* (1977) 67 Cal. App.3d 600 [136 Cal.Rptr. 787], where punitive damages were sought and made available against a railroad for maintaining a dangerous crossing without warnings or signal lights. That case, however, describes a crossing replete with evidence of its multifaceted dangerous conditions attributable to the railroad[3] and the fact even the railroad's own supervisors admitted the obvious threat posed by the crossing and yet the company never sought to provide any signals, flashing lights or other warning devices to protect the public. The extreme dangerous condition which was apparent to all by even a casual examination demanded some action. The failure to take action with full knowledge of the highly dangerous condition was, as the court pointed out, more than just "benign neglect" but rather "displayed a conscious and callous indifference to, or disregard of, probable harm to motorists [using the crossing]" (*id.* at p. 609). That case is clearly distinguishable. Here, while congestion occurred at the change of shifts when the signal stopped, nothing suggests the crossing itself was particularly unusual or vision of oncoming trains was obstructed. The failure to place warning lights or barriers on this crossing was not in such conscious and callous indifference to or disregard of probable harm as to constitute malice.

We find no error in the court's refusal to instruct on punitive damages as the facts here do not suggest a case of malice, either express or implied, or the callous indifference to or disregard of probable harm to the motorists.

■ Schreefel also claims the court denied him the right to introduce "evidence" of previous accidents through cross-examining the engineer and train foreman. However, he made no offer of proof to the trial court and the record shows nothing more than an inadmissible fishing expedition.

Judgment affirmed.

Brown (Gerald), P. J., concurred.

**WORK, J.,** Concurring and Dissenting.—I dissent from that part of the majority opinion which upholds the trial court's refusing to permit Schreefel's

---

[3]In *Seimon, supra,* 2,000 vehicles per day were using the crossing with a significant number of tractor-trailer truck rigs, no visual warning of oncoming trains was provided, vision was obstructed in two directions by buildings, the track intersected at a 59 degree angle at the crossing, there was a confusing street pattern, auto traffic had to "dog-leg" across the intersection, the angle of the train's approach to the intersection made it impossible, at least for one direction of traffic flow, to see the danger in time to stop the truck, only the train operator could anticipate the hazard, and in any event, the angle made difficult the assessing of a train's speed.

claim for punitive damages to be decided by the jury. The trial court's refusal to instruct the jury on punitive damages after the close of evidence effectively nonsuited Schreefel and the decision must be upheld or overturned on the well settled principles applicable to nonsuit. "A motion for nonsuit may properly be granted ' . . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' (*Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190]; see also *Blumberg* v. *M. & T. Inc.,* 34 Cal.2d 226, 229 [209 P.2d 1]; *Golceff* v. *Sugarmann,* 36 Cal.2d 152, 153 [222 P.2d 665].)" (*Palmquist* v. *Mercer* (1954) 43 Cal.2d 92, 95 [272 P. 26].)

Exemplary damages may be awarded when one acts in conscious disregard of the safety of others. (Civ. Code, § 3294.) The court prejudicially erred in removing this issue from the jury. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 807-808 [13 Cal.Rptr. 401, 362 P.2d 33].)

Schreefel alleged, and attempted to prove at trial, the Railroad acted in conscious disregard of his safety by not controlling the train sufficiently to be able to stop before striking vehicles they saw were stopped in plain view on the railroad crossing. An instruction regarding punitive damages was refused although the persons controlling the rolling train had often observed similar, extreme congestion at the crossing when employees of the shipyard attempted their routine mass exodus following a shift change. The situation was described as chaotic during those periods and the railroad knew there were no traffic controls to prevent motorists from intruding into the railroad crossing.

The railroad employees admit they braked to stop if the intersection did not clear but accelerated toward the intersection, unable to stop before reaching it after observing all stopped vehicles, including Schreefel's, clear the track. However, Schreefel testified his vehicle had been stopped on the track behind cars waiting for a light to change to proceed onto the highway. When the light changed, lines of traffic on each side of him moved forward but he could not because a vehicle immediately in front of him suddenly rolled backwards. Schreefel panicked, killed his engine and could not get it started in time to avoid the train striking him. His car remained on the track from the time the engineer first saw the congested intersection until the accident. Schreefel's version is as believable as that of the railroad employees, was corroborated by other witnesses, and is consistent with the well known customary rush-hour chaos in the area. If the jurors accepted Schreefel's version, they reasonably could have

believed the train accelerated without waiting for the crossing to clear. Under those facts an award of punitive damages would be proper.[1]

I would remand for trial on this limited issue.

The petition of plaintiff and appellant for a hearing by the Supreme Court was denied July 27, 1983. Bird, C. J., was of the opinion that the petition should be granted.

---

[1]In a practical sense, it is probably unrealistic to believe a jury would award punitive damages to Schreefel, whose negligence is a significantly greater cause of his injuries than the railroad. The relevance of this factor, if any, was not argued on appeal.