[No. S070935. Aug. 2, 1999.]

BENJAMIN HODGES, a Minor, etc., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
FORD MOTOR COMPANY, Real Party in Interest.

**COUNSEL**

Law Offices of David S. Rand, David S. Rand; Law Offices of Ellen Lake and Ellen Lake for Petitioner.

David J. Jung as Amicus Curiae on behalf of Petitioner.

Bell, McAndrews & Hiltachk, Charles H. Bell, Jr., Thomas W. Hiltachk and James F. Sweeney for California Insurance Commissioner Chuck Quackenbush as Amicus Curiae on behalf of Petitioner.

Remcho, Johansen & Purcell, Robin B. Johansen, Joseph Remcho, Kathleen J. Purcell and James C. Harrison for Congress of California Seniors, Consumer Attorneys of California, Latino Issues Forum, Greenlining Institute

and Utility Consumer Action Network as Amici Curiae on behalf of Petitioner.

Public Citizen Litigation Group, Brian Wolfman; Law Offices of Eugene N. Rosenberg and Eugene N. Rosenberg for Public Citizen and the Center for Auto Safety as Amici Curiae on behalf of Petitioner.

Robert Stern and Craig N. Holman for the Center for Governmental Studies as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Dryden, Margoles, Schimaneck, Kelly & Wait, Frank P. Kelly II, H. Grant Law; McGuire, Woods, Battle & Boothe, Grace R. Den Hartog, William H. King, Jr., E. Duncan Getchell, Jr., Joseph K. Reid III; Howard, Rice, Nemerovski, Canady, Falk & Rabkin and Jerome B. Falk for Real Party in Interest.

Mayer, Brown & Platt, Alen E. Untereiner, Kathryn Schaefer; Charles H. Lockwood II; Phillip D. Brady and Andrew D. Koblenz for the American Automobile Manufacturers Association and the Association of International Automobile Manufacturers, Inc., as Amici Curiae on behalf of Real Party in Interest.

Floyd Feeney and Carol S. Bruch as Amici Curiae.

---

**OPINION**

**MOSK, J.**—Petitioner Benjamin Hodges, an uninsured motorist, suffered injuries as the result of a rear-end collision that caused the gas tank of the Ford Mustang he was driving to rupture. He brought a products liability action against real party in interest Ford Motor Company (hereafter Ford), the manufacturer of the car, seeking compensatory and punitive damages.

Civil Code section 3333.4, enacted by the voters in the 1996 General Election as part of Proposition 213, precludes recovery of "non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement, and other nonpecuniary damages" by an uninsured motorist "in any action to recover damages arising out of the operation or use of a motor vehicle." We granted review to address the question whether any award against Ford in this matter for noneconomic losses would be barred by the provision. As we shall explain, the answer is *no*; the limit on

damages under Civil Code section 3333.4 does not apply to a products liability action brought by an uninsured motorist for injuries caused by a design defect.

## I

On June 24, 1995, Hodges was driving a borrowed 1967 Ford Mustang. The Mustang was not insured by its owner; nor did Hodges have automobile insurance. The Mustang stalled on the freeway and was struck from the rear by another car driving at high speed. The gas tank of the Mustang, which was located in the trunk, ruptured and expelled gasoline vapor into the passenger compartment, causing an explosion. The driver's seat collapsed, delaying Hodges's exit. He suffered injuries, including second and third degree burns over 26 percent of his body.

Hodges brought an action against Ford for personal injury, alleging that the Mustang gas tank was defective in design and seeking both compensatory and punitive damages. Ford moved for summary adjudication, asserting, inter alia, that Hodges was an uninsured motorist and was therefore barred under Civil Code section 3333.4 from recovering either compensatory non-economic damages or punitive damages.

The superior court denied the motion with regard to the issue whether Hodges could recover "any 'non-economic damages' " because it would not dispose entirely of a cause of action; it granted the motion with regard to the claim for punitive damages. Describing punitive damages as "a subset of non-economic damages," it characterized Civil Code section 3333.4 as "bar[ring] an uninsured motorist from recovering non-economic and non-pecuniary damages." It ruled that the bar, which operates in "any action to recover damages arising out of the use or operation of a motor vehicle," precluded Hodges from recovering punitive damages in his products liability action against Ford: "The undisputed facts in the record establish that [Hodges] was using and operating a motor vehicle at the time he was injured and that the accident would not have occurred had [he] not been so engaged."[1]

Hodges filed a petition for writ of mandate and the Court of Appeal summarily denied relief. We granted review.

We now hold that the trial court erred. A products liability claim against an automobile manufacturer falls outside the scope of Civil Code section

---

[1] Ford subsequently amended its answer to assert as a separate affirmative defense that Hodges is precluded under Civil Code section 3333.4 from recovering noneconomic damages against Ford. Code of Civil Procedure section 437c, subdivision (f)(1) permits a party to move for summary adjudication as to "one or more affirmative defenses."

3333.4. Accordingly, we are not called upon to resolve the question whether punitive damages are "nonpecuniary damages" within the meaning of the statute.[2]

## II

Civil Code section 3333.4 provides, in relevant part: "[I]n any action to recover damages arising out of the operation or use of a motor vehicle, a person shall not recover non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement, and other nonpecuniary damages if . . . [¶] . . . [¶] [t]he injured person was the operator of a vehicle involved in the accident and the operator can not establish his or her financial responsibility as required by the financial responsibility laws of this state." (*Id.*, subd. (a)(3).)[3]

■ The superior court apparently determined that the limits on recovery of noneconomic damages under Civil Code section 3333.4 apply in an action *of any kind* in which an uninsured motorist seeks damages that resulted *as a consequence of operating or using a motor vehicle*. Such conclusion was erroneous.

We begin by examining the meaning of the phrase "any action to recover damages arising out of the operation or use of a motor vehicle" as it appears in Civil Code section 3333.4. The language is not pellucid. The operative words are "operation or use." Does the statute refer to all actions arising out of the "operation or use" of a motor vehicle? That is, does it reasonably include an action for products liability brought *against a manufacturer* for a defect that became manifest during "operation or use"?

Nor, as we have previously observed, is the sense of the phrase "arising out of" transparent. Thus, in *Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181 [10 Cal.Rptr.2d 208, 832 P.2d 924] (*Central Pathology*), we considered the scope of a provision restricting claims for noneconomic damages "[i]n any action for damages *arising out of*

---

[2]Although, for the reasons discussed in the text, we conclude that summary adjudication was improper because Proposition 213 was not intended to apply to products liability actions, we express no opinion on the merits of the underlying action for products liability against Ford.

[3]Civil Code section 3333.4 also bars recovery of noneconomic losses to compensate for pain, suffering, and other nonpecuniary damages if the injured person was driving under the influence of drugs or alcohol and was convicted thereof (*id.*, subd. (a)(1)) or if the injured person was the owner of a vehicle involved in the accident and the vehicle was not insured (*id.*, subd. (a)(2)). It provides an exception to the bar against recovery of noneconomic losses when the owner of an uninsured vehicle is injured by a motorist driving under the influence of drugs or alcohol. (*Id.*, subd. (c).)

the professional negligence of a health care provider." (Code Civ. Proc., § 425.13, subd. (a), italics added.) In determining whether a cause of action for an intentional tort could be said to " 'arise out of' "—i.e., "to originate, grow, or flow from"—professional negligence for the purposes of Code of Civil Procedure section 425.13, we observed that the uncertainty was "not clarified by the words of the statute." (*Central Pathology, supra,* 3 Cal.4th at p. 188.) We looked, therefore, beyond the literal words of the provision, emphasizing that the scope and meaning of the phrase " 'arising out of professional negligence' " could vary depending upon the legislative history and "the purpose underlying each of the individual statutes" in which it appeared. (*Id.* at p. 192.) Here, similarly, our inquiry into the meaning of the phrase "arising out of"—specifically whether the statute contemplates that a products liability action is one "arising out of" the operation or use of a motor vehicle—requires us to look beyond the literal language of the provision.[4]

As the foregoing discussion shows, "[t]o seek the meaning of a statute is not simply to look up dictionary definitions and then stitch together the results. Rather, it is to discern the sense of the statute, and therefore its words, *in the legal and broader culture.* Obviously, a statute has no meaning apart from its words. Similarly, its words have no meaning apart from the world in which they are spoken." (*Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 673 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (conc. opn. of Mosk J.), italics in original.) We do not interpret the meaning or intended application of a legislative enactment in a vacuum. In the case of a voters' initiative statute, too, we may not properly interpret the measure in a way that the electorate did not contemplate: the voters should get what they enacted, not more and not less.

In this matter, therefore, we are obliged to interrogate the electorate's purpose, as indicated in the ballot arguments and elsewhere. Specifically, for the purposes of this matter, we address the narrow question whether the

---

[4]The uncertain meaning of the phrase "arising out of the operation or use of a motor vehicle" is also demonstrated by use of similar language in the Uniform Motor Vehicle Accident Reparations Act, which abolishes tort liability "arising from the ownership, maintenance, or use of a motor vehicle." (14 West's U. Laws Ann. (1990) U. Motor Vehicle Accident Reparations, § 5, p. 57.) The comment to the model statute explains that it *excludes* actions "against an automobile manufacturers for products liability." (*Id.* at p. 58.) There is also a split of out-of-state authority concerning the whether the phrase "arising out of the operation of a motor vehicle" applies to products liability actions in other contexts. (Compare. *Newman* v. *Ford Motor Co.* (Mo. 1998) 975 S.W.2d 147, 154 [Missouri statute limiting damages "[i]n any action to recover damages arising out of . . . operation of a motor vehicle" applies in products liability actions] with *Klinke* v. *Mitsubishi Motors Corp.* (1998) 458 Mich. 582, 589 [581 N.W.2d 272, 274] [Michigan statute limiting damages in actions "arising out of the . . . operation of a motor vehicle" does not apply in products liability actions].)

initiative statute limits recovery of damages by an uninsured motorist in a products liability case. After due consideration, we answer that question in the negative.

It seems clear that a primary aim of Proposition 213, as relevant here, was to limit *automobile insurance claims* by uninsured motorists. The electorate wanted to ensure that uninsured motorists, who contribute nothing to the insurance pool, would be restricted in what they receive from it. This principle of fairness fueled the initiative. The right to recover fully for an injury caused by a design defect, even by an uninsured motorist, has no bearing on any principle of fairness having to do with the financial responsibility laws. It is not clear that *anyone*—either the sponsors of the measure or the voters—intended to protect from products liability claims manufacturers who do not contribute to that pool and whose other insurance rates are not affected by the existence of uninsured motorists.

Proposition 213's statement of legislative purpose supports this view, identifying the principal intended beneficiaries of the measure as Californians who obey the financial responsibility laws. Thus, section 2 states the following "Findings and Declaration of Purpose": "(a) Insurance costs have skyrocketed for those Californians who have taken responsibility for their actions. Uninsured motorists . . . are law breakers and should not be rewarded for their irresponsibility and law breaking. However, under current laws, uninsured motorists . . . are able to recover unreasonable damages from law-abiding citizens as a result of . . . accidents . . . . [¶] (b) Californians must change the system that rewards individuals who fail to take essential personal responsibility to prevent them from seeking unreasonable damages or from suing law-abiding citizens. [¶] (c) Therefore, the People of the State of California do hereby enact this measure to restore balance to our justice system by limiting the right to sue of . . . uninsured motorists." (Ballot Pamp., text of Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 102.)

With regard to uninsured motorists, the "system" in need of change in order to "restore balance to our justice system" is the one that permits those who do not contribute to the insurance pool—and thereby drive up the costs of premiums for automobile insurance—to reap the benefits of the coverage paid for by law-abiding motorists. There is no suggestion that the proposed law would also change the "system" with regard to products liability claims, or that any such change is needed. Moreover, use of the words "Californians" and "law-abiding citizens" indicates that the initiative was aimed principally at providing balance for *those who obey the financial responsibility laws*, not benefitting manufacturers whose design and manufacturing processes are not subject to those laws.

Proposition 213's summary of arguments "pro" and "con" also indicates that the statute was primarily intended to limit awards against insured drivers. It explains: "A *yes* vote on this measure means: . . . uninsured motorists involved in collisions could recover only medical and out-of-pocket expenses but would be prohibited from recovering 'pain and suffering' awards *from insured drivers*." (Ballot Pamp., summary of arguments for and against ballot measures, as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 7, second italics added.) It summarizes the arguments against the measure as follows: "[T]he Insurance Lobby's newest No-Fault scheme rewards reckless drivers who hit innocent poor people. Proposition 213 lets reckless drivers avoid responsibility. No-Fault for reckless drivers. The No-Faulters say we save millions. But nothing in Proposition 213 No-Fault lowers our insurance rates." (*Ibid.*)

The ballot arguments, considered as a whole, similarly indicate that voters were being urged to distinguish between law-abiding motorists who pay for liability insurance, on the one hand, and law-breaking uninsured motorists who refuse to pay for such insurance, on the other. By limiting the amount of damages available to uninsured motorists, the law-abiding motorists would receive some savings in the form of reduced premiums. The arguments for and against the measure refer principally to remedying an imbalance in the justice system that resulted in unfairness when an accident occurred *between two motorists*—one insured and the other not. There is no suggestion that it was intended to apply in the case of a vehicle design defect.[5]

The ballot arguments thus emphasize that Proposition 213 was designed primarily for the benefit of "law-aiding citizens"—i.e., drivers who obey the financial responsibility laws: "[U]ninsured motorists can sue law-abiding citizens for huge monetary awards in addition to being compensated for medical and other expenses. [¶] These huge awards cost Californians who play by the rules and obey the law $327 million every year! That's not fair!" (Ballot Pamp., argument in favor of Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 50.) "Law-abiding drivers pay additional premiums to protect themselves from uninsured drivers. Eliminating huge monetary awards for irresponsible drivers will save $327 million each year!"

---

[5]We note that this matter does not require us to—and we therefore do not—address the application of the Proposition 213 to actions by uninsured motorists against other uninsured motorists or against state and local governments, e.g., for defective road design. As pointed out by the parties at oral argument, such matters may implicate concerns distinct from products liability actions against automobile manufacturers. Thus, the ballot materials indicate that voter approval of Proposition 213 would "result in fewer lawsuits filed against state and local governments" and refer to "unknown savings to state and local governments as a result of avoiding these lawsuits." (Legis. Analyst, Analysis of Prop. 213, Ballot Pamp., Gen. Elec. (Nov. 5, 1996), at p. 49.)

(*Id.*, rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996) at p. 51.)

It is true that the ballot arguments also demonstrate that the measure was intended to punish and deter scofflaws, i.e., drivers who do not obey the financial responsibility laws. By imposing heavy costs on disobeying the law, it would create an economic incentive for drivers to obey the law and to hold accountable those who do not. (See *Yoshioka* v. *Superior Court* (1997) 58 Cal.App.4th 972, 983 [68 Cal.Rptr.2d 553] [describing the purposes of Proposition 213 as including "increasing the costs of . . . disobeying California's Financial Responsibility Law" and "avoiding unreasonable damages being awarded to the uninsured"].) Thus, proponents of the measure argued: "PROPOSITION 213 SAYS PEOPLE WHO BREAK THE LAW SHOULD NOT BE REWARDED, WHILE LAW ABIDING CITIZENS PICK UP THE TAB. [¶] Law-abiding citizens already pay higher insurance premiums to cover uninsured motorists. Law-abiding citizens should *not* be punished for living responsibly! *The system needs to be fixed. Illegal behavior shouldn't be rewarded. People who break the law must be held accountable for their actions.* [¶] . . . [¶] STOP LAWBREAKERS FROM PROFITING FROM THEIR CRIMES. [¶] VOTE YES FOR PERSONAL RESPONSIBILITY." (Ballot Pamp., argument in favor of Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at p. 50, italics and all capitals in original.) The rebuttal to the argument against the initiative measure, similarly, urges: "PROPOSITION 213 REFORMS AN UNFAIR SYSTEM THAT REWARDS LAWBREAKERS AND PUNISHES THOSE WHO PLAY BY THE RULES. [¶] . . . [¶] VOTE YES FOR PERSONAL RESPONSIBILITY." (*Id.*, rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996) at p. 51, upercase in original.)

But the express goal of the initiative statute was restoring balance to the system, not simple retribution. Its stated purposes of punishing illegal behavior and encouraging personal responsibility are emphatically directed at "reform[ing] an unfair system" with respect to law-abiding drivers who "pick up the tab"—i.e., those who "play by the rules" and take "personal responsibility" (Ballot Pamp., argument in favor of Prop. 213 and rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996), at pp. 50, 51) but have been required to "pay additional premiums to protect themselves from uninsured drivers" (*id.*, rebuttal to argument against Prop. 213 as presented to the voters, Gen. Elec. (Nov. 5, 1996) at p. 51). There is no suggestion that such punishment or incentive was also intended—or should be permitted—to benefit manufacturers of defective vehicles, which are not reasonably included among "those who play by the rules" or "take personal responsibility" or "pick up the tab" for the "skyrocket[ing]" costs of automobile insurance. Thus, although it might

*theoretically* also punish illegal behavior to limit recovery against all tort-feasors, neither the statutory language nor the ballot materials reflect an intent to reform a system "unfair" to law-abiding insured motorists by providing a windfall to manufacturers of defective vehicles.[6]

Indeed, such a windfall would appear inconsistent with the long-standing public policy goal of requiring manufacturers to bear the costs of injuries from defective products. (See *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) As Insurance Commissioner Chuck Quackenbush, a proponent of Proposition 213, urges in an amicus curiae letter: "California motorists have a vital and ongoing interest in deterring manufacturers from shipping dangerous and unsafe products into California and in fairly compensating persons injured by defective products. That interest would not be well served by applying Proposition 213 to product liability claims." Nor does limiting damages against manufacturers of dangerous vehicles, which do not contribute to the insurance pool, appear to serve the core purpose of Proposition 213 of restoring balance to the insurance system by reinforcing the financial responsibility laws.

Nothing in the legislative history of the initiative suggests that the voters intended that result. In the absence of a clear expression of such intent, we decline to adopt a broad literal interpretation of the initiative that would raise such "substantial policy concerns." (*Calatayud* v. *State of California* (1998) 18 Cal.4th 1057, 1068 [77 Cal.Rptr.2d 202, 959 P.2d 360].)

III

For the foregoing reasons, we remand the matter to the Court of Appeal with directions to cause issuance of a peremptory writ of mandate directing

---

[6]Public statements by Proposition 213's proponents in addition to the printed ballot materials also indicate that application of the measure in products liability actions was not a consequence intended by its sponsors. Amicus curiae Insurance Commissioner Chuck Quackenbush, a proponent, points to testimony at a public hearing before the Joint Judiciary and Insurance Committees of the California Senate and Assembly, held before the 1996 election pursuant to Elections Code section 9034 and broadcast to voters throughout California by cable television. The statements therein by Commissioner Quackenbush and other sponsors of Proposition 213 clearly reveal that they had not previously considered its application to products liability actions against automobile manufacturers. At the hearing, they expressed the view that it could not reasonably be applied in such manner because "a strict liability cause of action" is "unrelated to the activity of the driver of the vehicle." Such statements by individual drafters of a measure's likely or "reasonable" application are, of course, as a general rule "not considered as grounds upon which to construe a statute. There is no necessary correlation between what the drafter understood the text to mean and what the voters enacting the measure understood it to mean." (*C-Y Development Co.* v. *City of Redlands* (1982) 137 Cal.App.3d 926, 932 [187 Cal.Rptr. 370].)

the trial court to vacate its grant of summary adjudication of the punitive damages claim and issue an order consistent with our decision herein.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.,** Concurring.—I agree with the majority that this poorly drafted, ambiguous statute should not be construed to apply to product liability actions. As we have said many times, when a statute's terms are ambiguous in a critical respect, we may properly look beyond the law's language to its history for clues to its intended meaning; this is as true of initiative measures as of statutes enacted in the Legislature. (See, e.g., *Legislature* v. *Eu* (1991) 54 Cal.3d 492, 504-505 [286 Cal.Rptr. 283, 816 P.2d 1309].) Proposition 213, as the majority opinion amply demonstrates, is ambiguous in its stated application to "any action to recover damages arising out of" operation or use of a motor vehicle. (Maj. opn., *ante*, at pp. 113-114; see *Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181, 187-188 [10 Cal.Rptr.2d 208, 832 P.2d 924].) Consequently, we may appropriately look to its legislative history. That history, as the majority opinion illustrates, supports our decision in this case.

I write separately because I cannot agree with the broadly nontextual approach to statutory interpretation reflected in the majority's statements that "we may not properly interpret [an initiative] measure in a way that the electorate did not contemplate" and that we must, therefore, look first to the electorate's "purpose." (Maj. opn., *ante*, at p. 114.) Initiative measures, no less than statutes enacted by the Legislature, should, when possible, be interpreted according to the usual and ordinary meaning of their terms. (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) With an initiative, as with a statute passed by bill, we should "focus first on the language" of the measure and seek therein its meaning. (*Legislature* v. *Eu, supra*, 54 Cal.3d at p. 503.) At times this will, indeed, mean that the law has consequences the voters did not specifically "contemplate." The majority's cure for this problem, however, is worse than the disease.

The legislative process is inherently laborious. Done well, it requires that a law's proponents take special care in drafting its provisions, and consult with those knowledgeable in the particular area of law involved, to ensure the statute is tailored to address the problem at hand and will not have too many unintended consequences. Initiative measures, which do not undergo the same review by legislative committees and the Governor as do bills, may not be well suited to making complex changes to statutory law in certain areas. Drafters of statutory initiatives may be well advised to narrow their

proposed measures if they cannot be certain what effects a broad and complex measure will have. Under the best of circumstances, legislation may turn out to overshoot or fall short of its intended mark, and might require "fine tuning" in a later session or at a later election. Again, since initiative statutes are typically harder to revise than those enacted by the Legislature, a prudent proponent will be particularly careful in drafting, and might consider limiting the measure rather than risk the unforeseen effects of attempting a broad statutory revision through initiative. Whether by bill or initiative, lawmaking can be time-consuming and inefficient.

In my view, however, the alternative—judicial revision of statutes to give the legislators or voters what the court thinks they "really" wanted—is worse. Without a bedrock assumption that this court will enforce the law as enacted, private individuals, government agencies, attorneys and lower courts have no firm basis for their decisions; drafters of legislation have little incentive to craft their products carefully; and, most important, the public has less assurance the court's decision will not be influenced by its members' personal policy views. (See *People* v. *Jefferson* (1999) 21 Cal.4th 86, 103-104 [86 Cal.Rptr.2d 893, 980 P.2d 441] (dis. opn. of Werdegar, J.).) For these reasons, our goal in construing initiative measures, as with legislatively enacted statutes, should ordinarily be to determine the objective meaning of the measure's provisions, not what specific applications we discern the voters subjectively "contemplate[d]" (maj. opn., *ante*, at p. 114) the measure would have.

There are occasions, of course, when literal construction of a statute is not possible, either because the law's terms are critically ambiguous or because literal interpretation would create a logically absurd application of the law, one completely beyond the subject matter of the legislation or one directly contrary to its expressed intent. But we should reach that conclusion only after making a sincere and thorough attempt to apply a statute—however it was enacted—according to its terms.